IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------------------------X

DRAGON SPRINGS BUDDHIST, INC.,

                      Plaintiff,

            -against-

TOWN OF DEERPARK, TOWN OF DEERPARK TOWN
BOARD, TOWN OF DEERPARK PLANNING BOARD,
KARL A. BRABENEC, in his Official Capacity as
Supervisor of the Town of Deerpark and Member of the
Town of Deerpark Town Board, DAVID M. HOOVLER, in
his Official Capacity as Deputy Supervisor of the Town of
Deerpark and Member of the Town of Deerpark Town
Board, GARY SPEARS, ARTHUR T. TROVEI, DAVID M.
DEAN, in their Official Capacities as Councilmen of the
Town of Deerpark Town Board, ALAN SCHOCK, in his
Official Capacity as Chairman of the Town of Deerpark
Planning Board, ROBERT VICARETTI, SR., in his Official
Capacity as Vice Chairman of the Town of Deerpark
Planning Board, WILLARD SCHADT, MICHAEL J.
HUNTER, CRAIG WAGNER, WILLARD SKIP WILSON,
DEREK WILSON, THERESA SANTIAGO and MICHAEL
BREITENFELD, in their Official Capacities as Members of
the Town of Deerpark Planning Board,

                    Defendants.

----------------------------------------------------------------------------X



Docket No. _____

**VERIFIED
COMPLAINT**

**JURY TRIAL DEMANDED**

13 CV 5968

JUDGE BRICCETTI

       Plaintiff, Dragon Springs Buddhist, Inc. ("Plaintiff" or "Dragon Springs"), by its

attorneys, Cuddy & Feder LLP (Joshua J. Grauer, Attorney No. 4594, Anthony B.

Gioffre, III, Attorney No. 9974, and Jordan Brooks, Attorney No. 0614), as and for its

Verified Complaint against Defendants, Town of Deerpark (the "Town"), Town of

Deerpark Town Board (the "Town Board") and its members in their official capacities,

and Town of Deerpark Planning Board (the "Planning Board") and its members in their

official capacities (altogether the "Town" or "Defendants") hereinafter alleges as follows:

## PRELIMINARY STATEMENT

1.    This is an action to redress, *inter alia*, Defendants' violations of Dragon Springs' rights under the United States Constitution and Religious Land Use and Institutionalized Persons Act. The multiple and continuous violations upon which this Verified Complaint is predicated arise from Defendants' actions with respect to, *inter alia*, a *pro forma* application filed by Dragon Springs on October 9, 2012 for the routine renewal of its Special Use Permit (the "Renewal Application") for its religious use of certain real property (defined more specifically hereinbelow as the "Property").

2.    Dragon Springs has operated as a "Place of Worship" as defined by the Town Zoning Law pursuant to, *inter alia*:  (i) a Special Use Permit issued by Defendant Planning Board in 2006 and renewed annually for the past six years; and (ii) Site Plan approvals issued by Defendant Planning Board, *inter alia*, in 2006 and 2011.

3.    After Dragon Springs filed the Renewal Application, Defendants amended the Town Zoning Law on March 25, 2013 to provide that a "Place Of Worship," like Dragon Springs, is a principally permitted use in Dragon Springs' zoning district, and, accordingly, no longer subject to regulation by Special Use Permit or renewal thereof (the "Zoning Amendment").  A copy of the Zoning Amendment is annexed hereto as Exhibit A.

4.    Notwithstanding the Zoning Amendment, Defendants, acting in concert and under color of law, have unlawfully compelled Dragon Springs to submit to the no longer applicable (and still "pending") Special Use Permit review and Site Plan approval processes as a condition of continued religious exercise at Dragon Springs.

2

5.     Even Defendants' own counsel recognized the absurdity of requiring Dragon Springs to continue to pursue Special Use Permit renewal, declaring at Defendant Planning Board's June 26, 2013 hearing that Dragon Springs is:

> . . . a house of worship, and if no special use permit is required for a house of worship, then how do we require them to have a special use permit?

6.     Nonetheless, Defendants have continued to require Dragon Springs to seek Special Use Permit renewal.

7.     Even assuming, *arguendo*, that the need for Special Use Permit renewal has not been obviated by the Zoning Amendment (which it has been as a matter of law), pursuant to Defendant Planning Board's 2006 Resolution (defined hereinbelow) that originally granted Dragon Springs' Special Use Permit, Dragon Springs' Special Use Permit "shall be automatically renewed," where, exactly as occurred herein in a very dilatory fashion, the Town certifies Dragon Springs' full compliance with all requirements of Dragon Springs' Site Plan approval.

8.     Yet, remarkably, despite having received such certification months and months ago, Defendant Planning Board has knowingly, shamelessly, and malevolently flouted its very own 2006 Resolution by compelling Dragon Springs to pursue Special Use Permit renewal for a period of approximately ten months and counting, even though renewal shall be a ministerial, "automatic" event upon receipt of such certification.

9.     In this regard, as will be demonstrated hereinbelow, Defendants trampled upon Dragon Springs' constitutional rights with regard to the Renewal Application well-before the Zoning Amendment.

C&F: 2202077.42

10. Moreover, Defendants have further compelled Dragon Springs to submit to an unlawful and *void ab initio* Site Plan review process, which also remains "pending," despite the fact that Dragon Springs has not proposed any new structures or modifications to existing structures on the Property (the "Redundant Site Plan Application"). Accordingly, there is no colorable basis for any present Site Plan review herein.

11. Defendants have intentionally and unlawfully held open these unnecessary and unlawful proceedings in order to exact an unconstitutional $150,000 cash payment from Dragon Springs for new, upgraded Town roads as a "condition" of their approval of the Renewal Application and Redundant Site Plan Application.

12. Defendants so proceeded despite Dragon Springs' repeated demand that Defendants recognize:

(i) That Dragon Springs' Renewal Application should never have been necessary because the prior renewals should have been granted automatically for a term far in excess of one year;

(ii) That, in all events, the Renewal Application should have been expeditiously approved administratively and automatically in October 2012 (or November 2012 at the very latest);

(iii) That Dragon Springs' Place of Worship became a principally permitted use pursuant to the Zoning Amendment;

(iv) That after the Zoning Amendment, Dragon Springs was and is no longer subject to regulation by Special Use Permit;

(v) That Dragon Springs already has permanent Site Plan approval and there is thus no conceivable legal basis for Defendants' mandated "new" Site Plan review; and

(vi) That virtually all of Dragon Springs' facilities were completed pursuant to valid Building Permits and certified with Certificates of Occupancy years ago.

4

C&F: 2202077.42

13.     Dragon Springs is, accordingly, entitled to permanent, uninterrupted enjoyment of its religious use as of right pursuant to Defendants' prior declaration of Dragon Springs' use as a Place of Worship and approvals of its facilities at the Property.

14.     That pursuant to the Religious Land Use and Institutionalized Persons Act, Pub. L. 106-274, § 2, 114 Stat. 803, 42 U.S.C. § 2000cc *et seq.* ("RLUIPA") Defendants, at all relevant times herein, were required by law to take all reasonable steps to accommodate Dragon Springs' religious use by the least burdensome means available to them.

15.     That at all times relevant to this action, Defendants have taken the polar opposite approach, openly and repeatedly discriminating against Dragon Springs in violation of its rights under the United States Constitution, RLUIPA, and other federal and state laws.

16.     Consequently, in this action Dragon Springs seeks, *inter alia*, a declaratory judgment, injunctive relief, and damages under 42 U.S.C. § 1983 for Defendants' constitutional and RLUIPA violations.

## JURISDICTION AND VENUE

17.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1343, 1651(a) and 2201, 42 U.S.C. § 1983 and 42 U.S.C. § 2000cc.

18.     The venue of this action is proper in the Southern District of New York, pursuant to 28 U.S.C. § 1391 (b) and (c). All parties either reside or transact business within the territorial bounds of this district.

C&F: 2202077.42

19.    Designation of The Hon. Charles L. Brieant, Jr. United States Courthouse is proper as the claims asserted herein arose in whole, or in major part, in the Town of Deerpark, which is located in the County of Orange and State of New York.

## PARTIES

20.    Dragon Springs was and is at all times relevant hereto a not-for-profit, tax-exempt religious organization under 26 U.S.C. § 501(c)(3).    All worshippers and religious practitioners at Dragon Springs conduct themselves in accordance with the principles of the religious belief, customs, and traditions of Falun Dafa.    The worshippers and religious practitioners of Falun Dafa seek to promote spiritual, mental, and physical improvement and wellbeing through five sets of easy–to-learn meditative exercises and, most importantly, through the religious teachings of Falun Dafa premised upon the universal principles of "Truth, Compassion, and Tolerance."

21.    Dragon Springs is established pursuant to the laws of the State of New York, and has an office located in the Town. It is duly organized for and coextensive with the religious purposes of its worshippers and practitioners, many of whom have been persecuted in their native country for their religious beliefs. Dragon Springs is further exempt from real property tax in the State of New York pursuant to Real Property Law § 420-a, together with all county and local taxes, including those related to public education.

22.    Defendant Town is located in the County of Orange and State of New York, and is organized pursuant to the laws of the State of New York.

C&F: 2202077.42

23.    Defendant Town Board, at all relevant times, consists of five members and meets at the Town Hall. It is vested with the statutory powers granted by the Town Law of the State of New York and the provisions of the Town Code.

24.    Defendant Karl A. Brabenec is the Town Supervisor and a Member of Defendant Town Board.

25.    Defendant David M. Hoovler is the Deputy Town Supervisor and a Member of Defendant Town Board.

26.    Defendants Gary Spears, Arthur T. Trovei and David M. Dean are Members of Defendant Town Board.

27.    Defendant Planning Board, at all relevant times, consists of seven members and meets at the Town Hall. It is vested with the statutory powers granted by the Town Law of the State of New York and provisions of the Town Zoning Law, including the duty and authority to review and grant Special Use Permits and Site Plan approval to legally conforming uses and site plans.

28.    Defendant Alan Schock is the Chairman of Defendant Planning Board.

29.    Defendant Robert Vicaretti, Sr. is the Vice Chairman of Defendant Planning Board.

30.    Defendants Willard Schadt, Michael J. Hunter, Craig Wagner, Willard Skip Wilson, Derek Wilson, Theresa Santiago, and Michael Breitenfeld are Members of Defendant Planning Board.

C&F: 2202077.42

## STATEMENT OF FACTS

### The Dragon Springs Property

31.     In the year 2000, Dragon Springs acquired a 427± acre parcel of land situated primarily in the Town (the "Property") to develop a Place of Worship, as defined under the Town Zoning Law, including educational and ancillary cultural uses, in facilities dedicated to religious principles and use.

32.     The Property is located within the Rural Residential (RR) Zone as classified by the Town's Zoning Law, and is primarily if not completely obscured from view off-site by ridgelines and topography.

33.     Dragon Springs purchased the Property for the construction of Chinese Tang Dynasty Temples and related facilities for a Place of Worship by its worshippers and practitioners, and for all other religious and related uses permitted at law, including ministerial and educational purposes.

34.     Dragon Springs' worshippers come from a variety of backgrounds and reside in various communities within and beyond the State of New York.

35.     For more than a decade, Dragon Springs has operated as a religious center for Falun Dafa worshippers and practitioners.

36.     Less than five percent of the 427 ± acre Property is improved with, *inter alia*, traditional Chinese Tang Dynasty style Temples and accessory structures, including a Bell House, a Drum Tower, religious statues, a visitors center, a multi-purpose building, residence halls, prayer halls, meditation halls, a library, classroom facilities, a multipurpose building with dining facilities, offices, a meeting hall, gazeboes, gardens

8

C&F: 2202077.42

and other related appurtenances essential to Dragon Springs' Place of Worship (altogether the "Temple").

37. Dragon Springs constructed the Temple at substantial cost pursuant to multiple Building Permits and Certificates of Occupancy issued by the Town.

38. Worshippers and volunteers have, at different times, visited the Temple for, *inter alia*, religious worship, doctrinal education, and meditation.

## Defendants' Recognition of Dragon Springs' Religious Use Of The Property And Rights Under RLUIPA

39. Dragon Springs first proposed its use of the Property as a Place of Worship when it submitted an application for, *inter alia*, Site Plan and Special Use Permit approval in or about March 2001 (altogether, the "2001 Application").

40. In connection with the 2001 Application, Dragon Springs requested that the Town Zoning Board of Appeals ("ZBA") issue an interpretation finding that Dragon Springs' proposal to construct the Temple was, at the time, a specially permitted use as a "Place of Worship."

41. The Town Zoning Law defines a Place of Worship as:

> A structure used for religious observances, such as a church, a synagogue or a temple, including a church school building, a parish office, a social hall, and a storage building.

(Emphasis added).

42. That religious education is included expressly as a component of a Place of Worship as defined under the Town Zoning Law.

C&F: 2202077.42

43.    On June 21, 2001, the ZBA issued a determination finding that Dragon Springs' use "falls clearly within the definition of Places of Worship" (the "ZBA Decision").

44.    The unanimous findings in the ZBA Decision are summarized as follows:

(i)    Dragon Springs is a tax-exempt, non-profit corporation organized exclusively for religious purposes as defined in 26 U.S.C. § 501(c)(3);

(ii)    Dragon Springs' use constitutes a Place of Worship as set forth in the Town Zoning Law;

(iii)    All of the structures on the Property are treated as a single unit based upon the cultural and religious traditions of Dragon Springs; and

(iv)    Multiple structures on a single lot are specifically permitted by the Town Zoning Law and/or under the accessory use of the structure definitions.

45.    The ZBA Decision also specifically acknowledged Dragon Springs' right to heightened protection from governmental interference with its use of the Property under RLUIPA:

> Federal Legislation mandates, in essence, that a local government may not impose or implement a land use regulation in a manner which imposes a substantial burden on a person's exercise of religious beliefs unless there is a compelling governmental interest and the regulation is the least burdensome way of furthering the compelling governmental interest.

46.    Dragon Springs has used the Property as a Place of Worship with full entitlement to all of the rights available to a recognized Place of Worship including, *inter alia*, those guaranteed by the Town Zoning Law and conferred under RLUIPA.

47.    That as expressly held in the ZBA Decision, all Defendants, including Defendant Planning Board, were obligated to comply with RLUIPA in all of their dealings with Dragon Springs.

C&F: 2202077.42

48. That at all times, Defendant Planning Board lacked legal authority to interpret the Town Zoning Law, because as a matter of law, interpretation of the Zoning Law is solely the province of the Town Building Inspector, with administrative review on appeal to the ZBA.

49. In addition, Defendant Planning Board lacked any authority to review, decide or opine upon the tax-exempt status of a non-profit religious organization as recognized by the ZBA Decision, and such status is irrelevant to any subject matter legally within Defendant Planning Board's authority and jurisdiction.

50. Nevertheless, Defendant Planning Board has, consistent with Town Policy, incessantly "interpreted" the Town Zoning Law to challenge Dragon Springs' tax exempt status, religious use since 2001 which regrettably continues to the date hereof.

51. In addition, since the ZBA Decision affirmed Dragon Springs' religious use, Defendants have openly and repeatedly discriminated against Dragon Springs, publicly disparaging and/or questioning their religion, religious use and religious practices during Planning Board meetings in the following outrageous and disrespectful manner:

> Anybody can do that by saying we'll hold prayer in our house today and it's a religious use and then doing their laundry becomes a religious practice.

-and-

> You can be in a car doing flips down the highway after hitting the guardrail, and believe me that's going to be a religious experience. I don't think anyone would argue that it's a church.

52. Consistent with Defendants' discriminatory treatment of Dragon Springs, no member of Defendant Planning Board or its staff took exception to any part of these

11

C&F: 2202077.42

deeply offensive statements about Dragon Springs' and its worshippers' religion, religious use, and religious practices.

53.   Since 2001, consistent with the Town's discriminatory policy, Defendants, acting under color of law, routinely subjected Dragon Springs and its worshippers to, *inter alia*:

(i)    Selective and discriminatory application and enforcement of Defendants' authority, as contrasted from what Defendants view as mainstream religious (tax-exempt) groups and landowners;

(ii)   Dilatory and discriminatory review of Dragon Springs' applications for municipal permits, including the Renewal Application;

(iii)  Discriminatory and *ultra vires* expansion of Defendants' limited authority under state law and the Town Zoning Law to require that Dragon Springs, *inter alia*, apply for unnecessary municipal permits and submit to unnecessary and everlasting municipal agency processes; and

(iv)   Attempted coercive exaction of certain "community benefits" from Dragon Springs in connection with Dragon Springs' municipal permit applications in unlawful and unconstitutional reparation for Dragon Springs' tax-exempt status as a religious organization.

54.   Here, Defendants have illicitly demanded a "community benefit" of $150,000 payable to the Town as the price for continued worship at Dragon Springs pursuant to Defendants' pending and unlawful Special Use Permit renewal and equally illegal "new" Site Plan approval processes.

**Defendants' Discriminatory And Unlawfully Burdensome Review Of Dragon Springs' Special Use Permit And Site Plan Applications Between 2001 and 2006**

55.   From 2001 to 2006, Dragon Springs pursued Defendants' approval of various applications as required by the Town Zoning Law for permission to build, use and occupy the Temple at the Property.

56.   Defendants thoroughly and exhaustively reviewed virtually every element of the Temple, frequently exceeding the broadest possible bounds of their statutory

C&F: 2202077.42

authority and in the process raising specious and pretextual challenges to Dragon Springs' use of the Property, thereby imposing unjustifiable and exorbitant costs upon Dragon Springs and requiring Dragon Springs to commence litigation to enjoin Defendants' illegal actions.

57. In conducting their review of Dragon Springs' applications, Defendants substantially burdened Dragon Springs and chilled and inhibited Dragon Springs' ability to practice its religion and assemble in violation of Dragon Springs' constitutional rights and Defendants' obligations under RLUIPA by, *inter alia:*

(i) Completely disregarding the legal and reasonable time limits for review; and

(ii) Imposing arbitrary costs, delays and "conditions."

58. As a result, Dragon Springs was forced to incur far greater cost and expense than typically imposed upon applicants that had previously submitted applications for development and use of their properties in the Town.

59. By way of illustration, without limitation, Defendants at one point attempted to impose an application fee of $25,000 for review of Dragon Springs' building permit application for its visitors' center, which unlawful and outrageous demand resulted in a legal challenge and settlement, causing Dragon Springs to incur substantial attorneys' fees and other substantial costs.

60. The foregoing exactions, imposed costs and attempts to obtain "community benefits" in lieu of taxes from Dragon Springs were part of a conscious effort to drain Dragon Springs' resources and limit religious exercise at the Temple on the basis of Dragon Springs' worshippers' religion and racial identity.

C&F: 2202077.42

61.     Defendants' discriminatory focus upon Dragon Springs' worshippers' race, religion, and national origin came to the surface on many occasions during Defendants' review processes.

62.     In one instance, upon Dragon Springs' discussion at a public meeting with Defendant Planning Board regarding Dragon Springs' security concerns, Defendant David M. Dean (then a member of Defendant Planning Board) openly and discriminatorily mocked Dragon Springs by stating:

> [T]his is the very first time that a threat from Chinese invaders has been mentioned to this Board.

63.     That during the course of Defendants' review of the 2001 Application, as amended, Defendants discriminatorily referred to Dragon Springs as, *inter alia*, "Moonies" and "these people," with repeated, unlawful inquiry into and interference with the internal operations of its religious use and worship.

64.     Defendants' outward hostility toward Dragon Springs has always been rooted, in part, in the fact that a religious use of the Property would exempt Dragon Springs from local property taxes and "take" the (427 ± acre) Property "off" of the municipal tax rolls.

65.     Defendants have long viewed Dragon Springs as a "deep pocket" and source of financial gain for the benefit of the entire Town, notwithstanding the fact that Dragon Springs is a tax-exempt, not-for-profit religious organization and an insular, self-sufficient Place of Worship for its worshippers.

66.     In this regard, with specific reference to Dragon Springs' tax-exempt status, then Town Board member Warren Cuddeback declared:

C&F: 2202077.42

14

> I am just trying to express to you the impact that this facility
> is having. And you have got to admit, that the residents in
> the area, as well as the whole Town of Deerpark, have a
> right to be concerned, because their taxes are going to pay
> for those who are tax-exempt.

67.   Similarly, one of Defendant Planning Board's former members once declared

during one of Defendant Planning Board's public meetings on Dragon Springs' 2001

Application that:

> . . . other citizens of Deerpark have to pay taxes on their
> land, and Dragon Springs is fortunate because they don't
> have to pay taxes, and he feels that Dragon Springs is
> abusing that privilege.

68.   Defendants and members of the community have thus been consumed with

Dragon Springs' tax-exempt status. As revealed from the minutes of yet another of

Defendant Planning Board's meetings:

> Just this past Monday night residents expressed concern
> about the facility being tax exempt, thereby increasing the
> property taxes to the tax-paying residents. Accordingly, the
> Town Board has directed the Town Tax Assessor to provide
> the Board with a written report regarding Dragon Springs'
> exemption . . . .

69.   This hostile municipal review process, tainted by discrimination based on

religious and ethnic animus, together with Dragon Springs' tax-exempt status, began

between March and November of 2001, during which time period Dragon Springs

submitted an Amended Site Plan application to Defendant Planning Board, and

continues to-date.

70.   Notwithstanding the foregoing, Defendants ultimately adopted a Negative

Declaration under the State Environmental Quality Review Act (SEQRA) for Dragon

C&F: 2202077.42

15

Springs' initial development of the Temple at the Property and granted Dragon Springs'
2001 Application in or about January 2002.

71.    Defendants' review continued through, *inter alia*, amended site plan
applications filed by Dragon Springs in February 2002 and August 2002.

72.    Dragon Springs' tax-exempt status remained a primary concern of Defendant
Planning Board despite the fact that its tax exempt status is completely outside the
purview of Site Plan and Special Use Permit review (and the lawful authority) of
Defendant Planning Board.

73.    By way of further illustration and without limitation, at another Planning Board
meeting, held on August 28, 2002, Defendant David M. Dean declared:

> Based on the ZBA Decision there were improvements done
> to this property, with no revenue for the Town in the form of
> taxes.

74.    The Town Engineer at the time recommended that Defendant Planning
Board require Dragon Springs to re-file an application with the ZBA to re-determine its
tax-exempt, religious status, despite the fact that such status was settled dispositively
by the ZBA Decision and is wholly irrelevant for zoning purposes.

75.    That no religious organization or non-profit organization in the Town was
ever subjected to such a proposed requirement, nor would such another organization
have ever been so treated by Defendants.

76.    This meeting of Defendant Planning Board then concluded with a further
attempt to discredit Dragon Springs' religious, tax-exempt status, with Defendant Derek
Wilson sponsoring a unanimously approved motion directing that the Planning Board

C&F: 2202077.42

secretary obtain documentation relative to the filing of taxes and tax status of Dragon Springs from the town tax assessor.

77.    This Motion was and is completely outside the limited statutorily delegated powers of a Planning Board.

78.    More than a year into Defendants' review of Dragon Springs' August 2002 Site Plan application, Defendant Planning Board, its members, and a former Town Engineer, Mr. Gainer, became obsessed with the internal operations of Dragon Springs' Temple.

79.    In this regard, on or about March 26, 2003, Defendant Planning Board presented a new, offensive, and discriminatory proposed draft resolution containing a new "condition" to impose on Dragon Springs, which also had no rational or legal basis whatsoever, as follows:

> To permit enforcement of the intended occupancy and use of the site, as specified by the applicant, the applicant shall maintain a written log to be made available to the Town's Code Enforcement Officer on demand.    Said log must contain the number and positions of anyone residing at the site, and the number of visitors to the site on a daily basis for the previous calendar month.

80.    Defendant Planning Board's intent to prepare a formal resolution of their decision on a Site Plan and Special Use Permit application was, in and of itself, highly irregular and contrary to Defendants' usual practice.

81.    Defendant Planning Board typically closes public hearings expeditiously and simply approves applications on the record, on the same day, in a matter of minutes, without requiring draft and final written resolutions.

17

C&F: 2202077.42

82. For other applicants, the minutes of Defendant Planning Board's meetings serve as the "resolution," with the few terms and provisions recorded in the minutes.

83. Dragon Springs is unaware of any point in the history of Defendant Planning Board where other non-profit applicants' applications for a Place of Worship were required to have a written resolution with the "conditions" imposed upon Dragon Springs herein.

84. At the next meeting when this draft resolution was discussed, Defendant Derek "Skip" Wilson requested that Dragon Springs maintain a written list or "log" of the people who worship there to be made available for the building inspector, "like a hotel has a log of visitors," as if the Town had any legal or constitutional authority to monitor the identities of those persons coming to the Property and Temple to worship and practice their religious beliefs.

85. During this frequently confrontational and adversarial Planning Board review and "inquisition," Defendants adopted a SEQRA Negative Declaration on March 12, 2003, and approved Dragon Springs' August 2002 Site Plan application on or about April 23, 2003.

86. Dragon Springs then submitted an amended Site Plan/Special Use Permit application to Defendants in or about August 2003.

87. Defendants' review of Dragon Springs' August 2003 application for, *inter alia*, use of the Temple as a Place of Worship and for the installation of the Temple Visitor Center, was rife with the same hostility and discriminatory acts that had troubled and burdened Dragon Springs throughout Defendants' earlier municipal review process.

C&F: 2202077.42

18

88.     As part of this process, Defendant Planning Board determined in the course of its review under the SEQRA, that Dragon Springs' August 2003 Site Plan application proposed "unlisted" activity, but incredibly, that Dragon Springs' prior development of the Temple required full review of the "cumulative impacts" of the entire Temple, therefore requiring Dragon Springs' to amend its application to include its proposals from each and every one of their previously approved applications.

89.     Unable to eliminate Dragon Springs and its worshippers from the Town altogether, and unsuccessful in their attempts to exact "community benefit" payments from Dragon Springs in lieu of taxes, Defendants next sought to reduce its worshippers to the smallest number imaginable to be allowed entry onto the Property.

90.     During Defendants' review of Dragon Springs' 2003 Site Plan Application, Defendants became particularly hostile to the internal details of Dragon Springs' worshippers' religious exercise at the Temple, with undue and discriminatory attention focused on the number of worshippers who would be allowed by Defendants even to be present on the Property at any given time.

91.     After Dragon Springs had vociferously objected to the illegal, arbitrary and discriminatory "log" condition, Defendant Planning Board changed its tack and insisted that the development and internal operations of Dragon Springs be restricted so that at any given time there would be a maximum population of 200 persons on Dragon Springs 427 ± acre Property, and that specific language be inserted into a resolution to that effect (the "Population Limitation").

92.     That Defendants consistently pressured Dragon Springs to "consent" to the Population Limitation, which is discriminatory and absurd on its face given the size of

19

C&F: 2202077.42

the Property and capacity of the Temple buildings, including at that time, three Temples, a Reflection Residence, Meditation Hall, and an outdoor open air stone terrace the size of several football fields.

93.     Defendants eventually coerced Dragon Springs to submit to a "100/100" Population Limitation — no more than 100 permanent residents at any time, and no more than 100 visiting worshippers on weekends only.

94.     That there was and is no lawful or bona fide purpose for the Population Limitation, and its obvious discriminatory purpose was and remains to this day to limit Dragon Springs' worshippers, whom Defendants consider different and undesirable, and to interfere with their rights to free exercise of their religion and assembly.

95.     That Defendants further unreasonably and discriminatorily sought to limit the presence of <u>any</u> children at Dragon Springs' Temple, compelling Dragon Springs to accept Defendants' condition that "there shall be no school age children permitted to reside at the facility" (the "Child Residency Ban").

96.     Defendants' review of Dragon Springs' 2003 Site Plan Application continued, albeit in a dilatory manner, while Defendants continued to contrive new and unduly burdensome conditions of approval as they unlawfully attempted to exact certain "community benefits" in lieu of taxes from Dragon Springs.

97.     In 2004, while Defendant Planning Board was still considering Dragon Springs' 2003 Site Plan Application, Defendants next attempted to compel Dragon Springs to purchase new firefighting equipment for the Town, and to construct facilities to house that equipment at Dragon Springs, the cost of which could easily have exceeded $1,000,000.

20

C&F: 2202077.42

98. At a meeting of Defendant Planning Board on or about February 25, 2004, certain members thereof aggressively attempted to force Dragon Springs to pay for such fire equipment under the opaque threat that unless Dragon Springs submitted to and complied with the unlawful exaction, the Town Fire Department should not respond to a fire at Dragon Springs' Property. In this regard, Defendant David M. Dean made four separate discriminatory comments, stating to the Town Fire Chief:

> "You shouldn't go up there."
>
> When the Fire Chief apparently could not believe what he was hearing from Defendant Dean he immediately replied: "What?"
>
> In response, Defendant Dean again stated: "You really shouldn't go."
>
> Again, the Fire Chief incredulously replied: "What?"
>
> This time Defendant Dean suggested that it would somehow be inequitable to risk the lives of the local fire fighters to rescue Dragon Springs' worshippers. He stated: "It's not fair."
>
> Defendants then burst into laughter, while the Fire Chief could still not comprehend what all of the laughter from the Town Engineer and other Planning Board members was about.
>
> The Fire Chief concluded this colloquy by asking: "What's not fair?" And by this point Defendants' laughter at Dragon Springs subsided and Defendant Dean remained silent.

99. No member of Defendant Planning Board or its staff, in maintaining consistent adherence to their discriminatory treatment of Dragon Springs, took exception to any part of this outrageous colloquy.

100. On another occasion Defendant Derek Wilson, in encouraging the Fire Chief to require Dragon Springs to purchase fire equipment for the Town, declared:

> This is the time to request what you need.

C&F: 2202077.42

21

and he concluded:

> Whatever he asks for, the Fire Department does not have to pay for . . . . The applicant has the ability to pay for any needed improvements.

(Emphasis added).

101. Defendants nevertheless granted amended Site Plan approval and a Special Use Permit to Dragon Springs, which contained the aforementioned Population Limitation and Child Residency Ban over Dragon Springs' objections, and adopted a SEQRA Negative Declaration on or about June 23, 2004.

102. That Defendants granted Dragon Springs' 2004 Special Use Permit subject to annual renewal.

103. Dragon Springs next had to return to Defendants for an amended Site Plan application in or about 2005. During the course of those proceedings, Defendants attempted to "explain" the rationale for the conditions "voluntarily" accepted by Dragon Springs.

104. By way of illustration, Defendant David M. Dean stated during a public hearing on May 24, 2006:

> I want to make sure that the people who live in this town are afforded the same rights as your client. Not more, but certainly not less. So, when the good people of this town express their concern about children at the site, it was not done to say, we hate children. It has to do with the economic impact of the school system of this town. That is where the no children situation came from. It's not something that we proposed, it's not something that we said you have to do, your client offered that.

105. Throughout, Defendants' hostility was shared by many members of the community and Defendant Planning Board. Consistent with the overall discriminatory

C&F: 2202077.42

policy of the Town, Defendant Planning Board not only allowed, but encouraged legally irrelevant, gratuitous, and offensive comments from the public vis á vis Dragon Springs' tax exemption to permeate its hearings; to wit:

> I want everybody on the Board to know last year I got hit with 27% last year.  I pay taxes.  This is all going to be again, tax exempt. . . .  I paid $6,000 last year in taxes, ask these people what they paid.  This is a big issue here.

106.  By way of further example, during a discussion of Dragon Springs and the beautiful workmanship and magnificent beauty of the Temple, at the Planning Board meeting of May 25, 2005, Defendant David M. Dean could only provide a backhanded "compliment" focused upon Defendants' perception of the resources of Dragon Springs. He declared:

> I wish everyone could afford to do that kind of job.

107.  As an example of the absurd and impermissible lengths to which Defendants have gone to burden Dragon Springs to the greatest extent imaginable, Defendant Planning Board even mandated Site Plan review and approval of basic kitchen facilities in the Visitors Center.

108.  In response to this abuse of authority by Defendant Planning Board, Dragon Springs' counsel noted at a July 26, 2006 public meeting that he had never before observed in his entire career any planning board ever conduct Site Plan review of a kitchen, declaring, in pertinent part, as follows:

> I'm not sure that I've ever appeared before a planning board to put a kitchen in an existing building.  Because it's not a really a site plan issue, it's an engineering issue.
>
> *     *     *
>
> [W]ith all due respect, it's really not a site planning issue.  It's a change in the internal operation of that building. . . .  So

23

C&F: 2202077.42

> from our perspective, again, you know, I don't know what you would have a hearing on. The public would say, what, you want a Whirlpool versus a Maytag in there? There's nothing for us to have a hearing about.

109. Indeed, under New York State Town Law, Defendant Planning Board's authority to compel "site plan review" of a kitchen is dubious:

> The required site plan elements which are included in the zoning ordinance or local law may include, where appropriate, those related to parking, means of access, screening, signs, landscaping, architectural features, location and dimensions of buildings, adjacent land uses and physical features meant to protect adjacent land uses as well as any additional elements specified by the town board in such zoning ordinance or local law.

N.Y. Town Law § 274-a.

110. Defendants' pattern of discrimination between 2001 and 2006 stands in stark contrast to the rights and approvals perfunctorily and expeditiously granted by Defendants to other religious and secular organizations and other property owners in the Town such as, *inter alia*, a local Young Men's Christian Association ("YMCA") development consisting of an approximately 1,000 acre parcel, which obtained approval to add a lodge to house forty-four individuals in a mere two weeks pursuant to a woefully incomplete application, "informal" review, and approval without any written resolution, conditions or attempted exactions.

111. During the entire period from 2001 to 2006, neither Defendant Planning Board nor any representative group of its constituent members ever even visited the Temple.

112. Defendants nevertheless ultimately issued all necessary approvals for Dragon Springs to complete the Temple in 2006, albeit only after extensive pretextual

C&F: 2202077.42

delays, the imposition of exorbitant costs, illegal, discriminatory, selective practices, and illegal demands that Dragon Springs pay, in cash, for its approvals by, *inter alia*, the purchase of expensive fire equipment (rejected by the Deerpark Fire Chief despite the Town's intense pressure), as well as the forced imposition of restrictions demonstrating discrimination and unlawful interference in Dragon Springs' religious use and internal operations.

### The 2006 Resolution Granting Dragon Springs Site Plan Approval And A Special Use Permit Subject To Unlawful Annual Inspection, Review And Renewal

113. Defendant Planning Board issued a Resolution approving a Special Use Permit and Site Plan for Dragon Springs on June 14, 2006 (the "2006 Resolution").

114. The 2006 Resolution further recognized Dragon Springs' broad right to use the Property as follows:

> [U]se and occupancy of the site will be for the construction of Chinese Tang Dynasty structures and worship by monks of the Buddhist School and other Buddhist School practitioners residing at and/or visiting the site and any other lawfully permitted use that is customary, incidental and/or appurtenant to the principal uses permitted herein.

115. That the 2006 Resolution granting Dragon Springs a Special Use Permit and Site Plan approval was itself the result of costly legal action by Dragon Springs, after which Defendants quickly resolved several issues complained of, thereby creating at the bare minimum a strong inference that the underlying action and inaction, by Defendants, respectively, which prompted that litigation in the first place, was improper.

116. The 2006 Resolution granted, in part, Special Use Permit approval to Dragon Springs to use the Property as a Place of Worship to the full extent of the law, subject

C&F: 2202077.42

to, *inter alia*, the unreasonably burdensome condition that Dragon Springs re-apply for

renewal annually (the "Annual Renewal Condition").

117. The Annual Renewal Condition expressly provides in pertinent part that:

> The Special Use Permit is granted for a period of one (1)
> year from the date of approval.  Prior to the end of the
> Permit period, the Applicant shall request renewal from
> [Defendant Planning Board] in writing, with a copy to the
> Building Inspector of the Town of Deerpark.  If, during the
> term of this permit, the Applicant shall evidence full
> compliance with all requirements of the Site Development
> Plan approval, and the Building Inspector certifies that fact
> to the Planning Board, then the Planning Board will process
> the renewal request administratively in accordance with the
> requirements of the [sic] § 230-49 of the Zoning Ordinance,
> and the Special Use Permit shall be automatically renewed
> for a period to be determined by the Planning Board without
> the need for further Special Use Permit review or
> appearance before the Planning board.  Future renewals
> shall also utilize the same procedure.

(Emphasis added).

118. That the Annual Renewal Condition's provision for inspection by the Town

Building Inspector is a pretext for an annual intrusive, disruptive, "surprise" on-site

inspection of Dragon Springs' Property and Temple.

119. That, upon information and belief, Defendants have never subjected another

Place of Worship to conditional annual renewal after on-site inspection by the Town.

120. That no reasonable Planning Board Member, Building Inspector or Town

Engineer ever could have asserted on any reasonable basis that Dragon Springs' use

as a Place of Worship, as previously and dispositively determined by the ZBA Decision,

should be subject to annual inspection, review, and renewal, but Defendants and their

predecessors have continuously imposed this discriminatory condition upon Dragon

Springs, never once approving a renewed Special Use Permit for a period greater than

C&F: 2202077.42

one year.

121. That the Annual Renewal Condition is, essentially, a condition imposed by Defendants granting them *carte blanche* to engage in an annual inquisition into the religious use of the Temple at the Property and Dragon Springs' worshippers' faith and religious exercise.

122. That Defendants have used the Annual Renewal Condition to impose unlawful and substantial burdens upon the religious use of Dragon Springs' Place of Worship in violation of Dragon Springs' rights.

123. That Defendants' yearly inquisition into Dragon Springs under the patently unreasonable Annual Renewal Condition chills the free exercise of religion at Dragon Springs.

124. The United States Constitution, RLUIPA and the ZBA Decision entitle Dragon Springs, as a religious entity whose members are mostly of Chinese and Asian descent, to use its religious facilities as a place to exercise its rights to free speech and religion, and to make lawful use of the Property without Defendants' repeated selective, discriminatory treatment and Defendant Planning Board's nefarious imposition of, *inter alia*, the Annual Renewal Condition.

## Defendants' Unduly Burdensome And
## Unlawful Population Limitation And Child Residency Ban

125. That at all times relevant herein, Dragon Springs' only desire and principal use of the Property has been the continuance of the peaceful practice of its religion, keeping of its faith, and teaching of its tenets and traditions with the respect and solemnity that its worshippers hold dear.

27

C&F: 2202077.42

126. Defendants have imposed in every Special Use Permit issued to Dragon Springs an illegal, *ultra vires*, unconstitutional, discriminatory and unprecedented Population Limitation on Dragon Springs' 427± acre Property, limited to no more than 100 permanent residents at any time, and no more than 100 visitors on weekends only.

127. That the result of the Population Limitation has been Defendants' effective prevention and intimidation of Dragon Springs' worshippers in accessing and worshipping at the Property and Temple.

128. That the total maximum occupancy for Dragon Springs' Place of Worship at the Property, as set forth by Defendant Town's Building Department in Certificates of Occupancy for the Temple is approximately 6,656 persons.

129. That the table below contains a summary of relevant information for Certificates of Occupancy issued by Defendants to Dragon Springs for the Temple buildings:

| **Building** | **Maximum Occupancy** (Persons) |
|---|---|
| Cafeteria Building (Educational Use) | 1,815 |
| RR Building (Residence Hall for educational use) | 961 |
| Multipurpose Building | 2,500 |
| Visitor Center | 356 |
| Lecture Hall | 650 |
| Mediation Hall | 374 |
| **Total Certified Max. Occupancy** | **6,656** |

130. That the approved septic capacity for the Property allows 307 regular worshippers, and that appropriate sanitary facilities could be provided for larger events at the Temple.

C&F: 2202077.42

131. That no reasonable Planning Board Member, Building Inspector or Town Engineer ever could have asserted on any reasonable basis that the 427± acre Property was appropriately subject to the Population Limitation, but Defendants and their predecessors have continuously imposed this discriminatory condition upon Dragon Springs, not even permitting Dragon Springs a maximum permanent occupancy consistent with the limits of its septic system, which is designed to accommodate the household wastewater of approximately 307 permanent residents.

132. By way of illustration and without limitation, Defendants have never imposed such a limitation on the aforementioned 1,000 acre YMCA facility, which obtained its approval for an additional forty-four person lodge from Defendant Planning Board in two weeks.

133. That despite the sheer size of the Property and the total permitted occupancy of 6,656 worshippers (and a septic capacity for 307 permanent residents), and that Dragon Springs exists, *inter alia*, as a center for religious practice and study as well as a sanctuary for those persecuted on the basis of their religious beliefs, and that the number of its worshippers should never have been limited, in fact Dragon Springs has at all times exercised its best efforts to comply with the Population Limitation, which has been imposed as a condition of all renewed Special Use Permits.

134. That in the twelve years that have elapsed since 2001, Dragon Springs has never applied even for one mass gathering permit, thereby further demonstrating how Defendants' restrictions chill Dragon Springs' worshippers' free exercise of their religion at the Property and have unlawfully burdened Dragon Springs' rights protected by RLUIPA.

C&F: 2202077.42

135. That Defendants' imposition of the Population Limitation upon Dragon Springs' religious use, enjoyment, worship and religious education at the Property is a continuing, actionable wrong with each and every day constituting a violation of Dragon Springs' rights by Defendants acting in concert, under color of law, and in furtherance of an official Town policy.

136. That notwithstanding Dragon Springs' coerced submission to the unlawful Population Limitation, Defendants have been, at all relevant times herein, consumed with the internal operations of Dragon Springs' faith and precise number of worshippers at the Property.

137. That Defendants have persistently discriminated against Dragon Springs by, *inter alia*, disrespectfully inquiring into how many of the people on the Property are worshippers or practitioners who are and are not "Monks," a discriminatory and disrespectful inquiry into the internal composition of Dragon Springs' religious constituency.

138. Defendants' obsession with Dragon Springs' religious constituency and the exact number of worshippers on site every minute of every day is strong evidence of unequal, disparate and discriminatory treatment, and extends even further into the internal operational details of Dragon Springs and its worshippers' daily religious exercise.

139. That Defendant Planning Board has also acted beyond its legal authority by, *inter alia*, including in the 2006 Resolution a blanket prohibition on "school age children permanently residing at the premises," *i.e.*, the Child Residency Ban.

C&F: 2202077.42

140. That the pretext of the Child Residency Ban was and is to avoid any potential "burden" upon residents of the Town by even one of Dragon Springs' worshippers' children attending a local public school.

141. That the illegal Child Residency Ban has profoundly affected Dragon Springs' worshippers' free exercise, keeping of their faith and the internal operations thereof.

142. Dragon Springs never freely consented to the illegal, coercive Child Residency Ban, representing at a May 24, 2006 meeting of Defendant Planning Board that:

> [R]egarding the children . . . that issue, when the questions were answered we said at that time no children would be residing. . . . That changes it into a term which we now think is illegal in the resolution. Because at that time we were addressing the text [sic[1]], the board was addressing the text issue. The text [sic] concerns, so no children will impact the school system. So, we were addressing that. But that tends to be an illegal term in the resolution that prohibits our rights.

143. That, without question, Defendant Planning Board would never have repeatedly challenged the religious use of Dragon Springs' Temple (and regulated unlawfully the internal operational details in the manner involved herein by imposing the Population Limitation and Child Residency Ban), if what Defendants view as a mainstream religion or local applicant had been involved in the same exact project involving the same exact Temple.

144. The United States Constitution and RLUIPA entitle Dragon Springs, as a religious entity whose members are mostly of Chinese and Asian descent, to use its religious facilities as a place to exercise its rights to free speech, assembly and of

---

[1] The word used on the record was "tax;" the word "text" is an error in transcription.

C&F: 2202077.42

religion, and to make lawful use of the Property without Defendants' repeated, selective, discriminatory treatment and Defendant Planning Board's nefarious imposition of, *inter alia*, the Population Limitation and Child Residency Ban.

### Defendants' Continuous Failure to "Automatically" Renew Dragon Springs' Special Permit and Continuous Refusal To Extend Dragon Springs' Special Permit For A Period of More Than One Year

145.  In furtherance of its endless and spiteful crusade to chill and burden Dragon Springs' free exercise of religion at the Property, in 2006, 2007, 2008, 2009, 2010, and 2011, respectively, Defendant Planning Board unlawfully imposed the Population Limitation, and the Child Residency Ban in the 2006 Resolution, respectively, but also unlawfully and unreasonably restricted the renewal term of Dragon Springs' Special Use Permit in each of the six previous renewed Special Use Permits granted by Defendants to only one year.[2]

146.  That as a result, at great cost and harm to Dragon Springs, it was compelled to reapply for renewal of its Special Use Permit annually, providing Defendants with exactly what they wanted; to wit: the opportunity to engage in an annual inquisition into the religious use of the Temple at the Property and Dragon Springs' worshippers' faith and religious exercise.

147.  That in connection with Dragon Springs' annual applications for renewal of its Special Use Permit, Dragon Springs repeatedly placed Defendants on actual notice that, pursuant to the 2006 Resolution, upon the Building Inspector's certification to Defendant Planning Board that there are no violations against the Property, Defendant Planning Board is obligated to renew Dragon Springs' Special Use Permit, without any

---

[2] Of course, the Renewal Application, submitted in 2012, is still "pending."

C&F: 2202077.42

further public hearings, meetings, review or additional approvals or submissions on the subject.

148. That at the time of each and every renewal request during the time period of 2006 through the date of the Renewal Application there were no violations against the Property, a fact confirmed annually by the Town Building Inspector.

149. That despite the foregoing, Defendants have consistently and purposefully delayed approval of Dragon Springs' renewal applications in derogation of the unmistakable terms of the 2006 Resolution.

150. That in connection with each and every *pro forma* request for renewal of Dragon Springs' Special Use Permit, including the Renewal Application, Dragon Springs repeatedly and specifically requested that the renewal term be extended to at least three or five years, inasmuch as the annual renewal term is not only unreasonable, but shorter than that imposed upon all other similarly situated applicants.

151. By way of example, by letter dated June 21, 2007 to Defendant Planning Board's counsel, in response to counsel's shocking request for a meeting to discuss renewal of Dragon Springs' Special Use Permit, counsel for Dragon Springs wrote as follows:

> According to the Planning Board's own resolution, this renewal process should have been a simple process. It is an 'administrative process' that should not require an appearance before the Planning Board and the permit should have been 'automatically renewed' as there are no existing violations. . . . The Building Inspector received our client's written request a few weeks ago. He could have easily "reported" at that time and confirmed that there have been no violations in the past year. . . . Under all of the facts and circumstances, we believe Dragon Springs is entitled to renewal of their Special Permit for a period of at least five (5) years.

33

152. Defendant Planning Board eventually renewed Dragon Springs' Special Use Permit, but only for a period of one year.

153. The following year, by letter dated March 14, 2008 to Defendant Willard Wilson and the members of Defendant Planning Board, Dragon Springs once again sought renewal of its Special Use Permit. In doing so, it noted that "[t]here are no violations on the Premises and extension of the Special Permit is warranted" and that "[a]s the Board is aware, renewal of the Special Permit is an 'administrative process' that should not require an appearance before the Planning Board and the permit should be 'automatically renewed.'" Dragon Springs further sought renewal for a period of at least three years.

154. Three months later, having not received the renewal mandated by the 2006 Resolution, Dragon Springs followed up with Defendant Willard Wilson and the members of Defendant Planning Board by letter dated June 11, 2008, in which Dragon Springs reinforced that "renewal of the Special Permit is an 'administrative process'" and "the permit should be 'automatically renewed.'"

155. Nearly two months later, Defendant Planning Board had still not renewed Dragon Springs' Special Use Permit (but had received confirmation from the Building Inspector that there were no violations on the Property).

156. By letter dated July 30, 2008, Dragon Springs reiterated that "the renewal of the Special Use Permit should be perfunctory and there is no reason why this cannot and should not proceed expeditiously and without incident." In the same letter, Dragon Springs stated that "it is wholly appropriate that the Planning Board grant a three year extension to Dragon Springs' Special Permit."

C&F: 2202077.42

157. After another two weeks had elapsed without the perfunctory renewal directed by the 2006 Resolution, by letter dated August 13, 2008, Dragon Springs once again wrote to the very same Defendants seeking Special Use Permit renewal.

158. Incredibly, rather than following the express terms of the 2006 Resolution and "automatically" renewing Dragon Springs' Special Use Permit, the Planning Board scheduled a meeting to "vote" on Dragon Springs' application for renewal.

159. In response to the improper scheduling of that meeting and the unwarranted and intentional delay associated therewith, Dragon Springs advised Defendant Willard Wilson and the members of Defendant Planning Board that not only had the annual renewal of Dragon Springs' Special Use Permit "been mandated" by Defendant Planning Board, but also that annual renewal requirement is inconsistent with RLUIPA on "account of unequal terms, on account of discrimination, and on account of unreasonable limitations."

160. Eventually, after months and months of inexplicable delay, in mid-September 2008, Dragon Springs' Special Use Permit was renewed for only one year.

161. By letter dated July 30, 2009, Dragon Springs once again performed its annual ritual of applying for renewal of its Special Use Permit. In that letter, it reminded Defendants Willard Wilson and the members of Defendant Planning Board that "renewal of the Special Permit is an "administrative process" and that the "permit should be automatically renewed," while also requesting "that the Special Permit be extended for a period of at least five (5) years."

C&F: 2202077.42

162. Approximately two months following the July 30, 2009 letter, Defendant Planning Board finally renewed Dragon Springs' Special Use Permit, but did so for a period of only one year.

163. By letter dated August 13, 2010 to Defendant Willard Wilson and Defendant Planning Board, Dragon Springs sought renewal of its Special Use Permit. In that letter, Dragon Springs reminded the aforementioned Defendants of the ministerial nature of the renewal given the absence of any violations on the Property. Dragon Springs also sought an extension of its Special Use Permit for a period of at least five years.

164. Defendant Planning Board reluctantly granted Dragon Springs' renewal request, but did so for only one year.

165. That given the absence of any violations on the Property at the time of each and every one of Dragon Springs' annual renewal applications, Defendants' persistent and continuing refusal to extend Dragon Springs' Special Use Permit for a period of more than one year inflicts an impermissible burden upon the religious use of Dragon Springs' Place of Worship in violation of Dragon Springs' rights.

166. That given the absence of any violations on the Property at the time of each and every one of Dragon Springs' annual renewal applications, Defendants' persistent and continuing refusal to renew Dragon Springs' Special Use Permit "automatically" – despite annual reminders from Dragon Springs of Defendant Planning Board's self-imposed obligation to do so – inflicts an impermissible burden upon the religious use of Dragon Springs' Place of Worship in violation of Dragon Springs' rights.

C&F: 2202077.42

## Dragon Springs' Use Of The Property For Educational Activities And Defendants' 2011 Site Plan Approval Of Expanded Religious Education Facilities

167. Since 2006, Dragon Springs has used the Property peaceably in furtherance of its religious purposes as guaranteed by the ZBA Decision and in compliance with the requirements of the 2006 Resolution, including the unlawful Annual Renewal Condition, Population Limitation, and Child Residency Ban.

168. Religious education is central to Dragon Springs' worshippers' faith and the teaching and continuation of their faith and tradition, especially amongst Dragon Springs' worshippers, who in China are persecuted systemically for their beliefs.

169. That religious education (together with or separate from secular education) is a proper use of a Place of Worship as defined under the Town Zoning Law, as approved by Defendants in and by the ZBA Decision and 2006 Resolution.

170. Dragon Springs' permitted use as a Place of Worship includes religious education and approved buildings with, *inter alia*, classrooms, a library, a multi-purpose building where, among other uses, religious performing arts are practiced, residence halls and a dining hall, all of which were approved by Defendants years ago, with certificates of occupancy issued for all of these facilities.

171. That the operation by Dragon Springs of religious educational facilities for school age children and young adults to teach, maintain and develop their faith and tradition is a proper, lawful component of a Place of Worship.

172. That Dragon Springs' library and classroom facilities, together with the performing arts center and library, were prominently featured on the site plan drawings approved by Defendant Planning Board in and by the 2006 Resolution.

37

C&F: 2202077.42

173. Dragon Springs' educational use is further consistent with Defendant Town's express policy from the very outset that it had no desire to educate the children of Dragon Springs' worshippers, as it viewed any obligation to provide public education to the children of Dragon Springs' worshippers as an unacceptable burden.

174. That, between 2007 and 2009, Dragon Springs established a school at the Temple for the religious purpose of providing an educational environment of learning and self-improvement to students based on Falun Dafa principles of truthfulness, compassion and forbearance.

175. In 2010, Dragon Springs applied to Defendant Planning Board for an amended Site Plan approval for expanded educational facilities at the Temple.

176. That consistent with Defendants' accepted policy to discriminate against Dragon Springs by imposing artificial (and illegal) delays in reviewing applications and granting approvals for even the most basic land use permits, Defendants took over one year to review Dragon Springs' 2010 Site Plan application.

177. That Dragon Springs' application narrative in support of its 2010 Site Plan application plainly stated that the purpose of the application was "for additional educational facilities."

178. The large scale drawings submitted by Dragon Springs in support of its 2010 application for Site Plan approval prominently noted:

> PREVIOUSLY APPROVED CAFETERIA RESIZED FOR
> CAFETERIA & ADDITIONAL EDUCATIONAL FACILITIES

179. That the same drawings included and identified on their face a "Cafeteria & Educational Building."

C&F: 2202077.42

180. That the same drawings also included and identified on their face, *inter alia*, "Dancing Classroom[s]," "Music Classroom[s]," "Study Rooms," a "Music Practice Room," the "Approved Library," "Dormitory" facilities, a "Stage," and a "Teacher's Office."

181. That on April 23, 2011, Defendants finally approved Dragon Springs' 2010 Site Plan application for expanded educational facilities at the Property as a proper and legal part of its approved Place of Worship.

182. Thereafter, consistent with Defendants' approvals, Dragon Springs expanded its religious educational programs at the Property and Temple.

183. That Defendants' prior approval of such facilities in 2006 and 2011 negates any claim that religious education is a new or different use than the religious and educational use previously approved by Defendants and, in any event, is a proper component of an approved Place of Worship.

184. That no Special Use Permit review (or condition imposed therein) may interfere with the internal operations of a religious use; *a fortiori*, such review and the "conditions" of any resolution relating to a recognized religious use may not interfere with the internal operations of a church, synagogue or, in the case at bar, Dragon Springs and the Property dedicated herein to worship, practice, education and culture.

185. That neither the Town Zoning Law nor ZBA Decision requires any further approval from Defendants for continued religious educational use of the Temple at the Property, because, *inter alia*, Dragon Springs' Place of Worship became a permitted principal use pursuant to Zoning Amendment.

C&F: 2202077.42

186. That Dragon Springs expended substantial sums of money to design and build, *inter alia*, its library, classroom facilities, study rooms and practice rooms for religious education pursuant to Building Permits and Certificates of Occupancy, all as approved by Defendants in the ZBA Decision, 2006 Resolution and 2011 Site Plan approval.

## Dragon Springs' Pending Renewal Application

187. On October 9, 2012, Dragon Springs filed its Renewal Application with Defendant Planning Board as required by the Annual Renewal Condition of the 2006 Resolution, which Defendants have included in all subsequent renewed Special Use Permits thereafter granted to Dragon Springs.

188. The Annual Renewal Condition provides, in pertinent part, that Dragon Springs' Special Use Permit "shall be automatically renewed," upon the submission of a "request . . . in writing," so long as, "during the term of this permit, the Applicant shall evidence full compliance with all requirements of the Site Development Plan approval, and the Town Building Inspector certifies that fact to the Planning Board."

189. Dragon Springs' Renewal Application was in complete compliance with the Annual Renewal Condition in that it was a "request" made "in writing," like each of Dragon Springs' previous applications for renewal of its Special Use Permit, which Defendant Planning Board granted automatically upon administrative review, without any public hearings, albeit with varying degrees of unreasonable and discriminatory delay and only for one year.

190. After filing its Renewal Application, Dragon Springs was entitled to an inspection by the Town Building Inspector within a reasonable period of time.

C&F: 2202077.42

191. That the absolute latest such inspection should have been concluded was no later than the end of October 2012.

192. Nevertheless, consistent with the Town's discriminatory policy against Dragon Springs and its worshippers, Defendants unreasonably delayed administrative review of Dragon Springs' Renewal Application as part of a larger pattern of animus against Dragon Springs spanning over a decade.

193. That at all times, Defendant Planning Board's authority to conduct lawful Special Use Permit review was coterminous with the provisions of New York State Town Law § 274-b.

194. That in New York State Town Law § 274-b required Defendants to commence a public hearing within sixty-two days of Dragon Springs' filing of its complete Renewal Application on October 9, 2012, and to then issue a decision within sixty-two days from the close of the public hearing, notwithstanding that, in accordance with the Annual Renewal Condition, the Renewal Application should have been approved administratively without such a hearing in October 2012.

195. Likewise, Section 230-47 of the Town Zoning Law provides, in relevant part, as follows:

> The Planning Board shall fix a time, within sixty-two (62) days from the day the Board deems complete an application for a Special Use permit or site plan approval is made, for the hearing of any matter referred to under this section. It shall give public notice of such hearing at least five (5) days prior to it in a newspaper of general circulation in the Town and decide upon the application within sixty-two (62) days after such hearing. It shall not, however, grant approval before a decision has been made with respect to environmental impacts pursuant to SEQRA. The decision of the Planning Board shall be filed in the office of the Town

C&F: 2202077.42

Clerk and a copy thereof mailed to the applicant within five
(5) business days after such decision is rendered.

196. Because Dragon Springs filed its Renewal Application on October 9, 2012, Defendants were legally obligated under the New York State Town Law and the Town Zoning Law to commence a public hearing no later than December 10, 2012.

197. Defendants nevertheless abjectly failed to notice and commence a public hearing by December 10, 2012, as required by both New York State Town Law § 274-b and Section 230-47 of the Town Zoning Law.

198. In or about early January 2013, nearly three months after Dragon Springs filed its Renewal Application and nearly a month after Defendant Planning Board should have commenced a public hearing, the Town finally conducted an inspection of Dragon Springs' Property and the Temple.

199. On or about January 3, 2013, Defendant Planning Board received a written certification from the Town Engineer confirming that Dragon Springs had satisfied the only condition precedent to automatic renewal of its Special Use Permit, declaring that the Town's inspection (the "Town Engineer's Certification"):

[R]evealed that all work in progress was within the Planning
Board and Building Department parameters.

200. That upon Defendant Planning Board's receipt of the Town Engineer's Certification, Dragon Springs became entitled, then and there, to the automatic renewal of its Special Use Permit pursuant to the express terms of the Annual Renewal Condition.

201. That neither the Town Engineer nor Defendant Planning Board has the legal authority to interpret the Town Zoning Law or to make any determination with respect to

42

C&F: 2202077.42

Dragon Springs' compliance therewith, or with any other zoning approvals previously issued to Dragon Springs.

202. That in the Town Engineer's Certification, he preposterously "determined," despite an utter lack of authority to make any such determination, that Dragon Springs should be compelled to undergo a "Site Plan modification" and "Special Use Permit modification and time period" based on his interpretation of the Town Zoning Law, finding that Dragon Springs was conducting religious educational activities as part of its religious use of the Property; specifically, that there was a "school and college" on the Property but that "[o]riginally we felt the classrooms, library, etc. was [sic] for religious purposes (i.e., Sunday school)."

203. That the Town Engineer's "determination" that Dragon Springs undergo "Site Plan modification" and "Special Use Permit modification and time period," based on his interpretation of the Zoning Law, was completely unlawful because only the Town Building Inspector has the legal authority to interpret the Zoning Law and make any such determination.

204. Defendants nevertheless refused to grant Dragon Springs' Renewal Application as they proceeded to adopt the Town Engineer's *ultra vires*, unlawful and erroneous determination, and compelled Dragon Springs to undergo both Special Use Permit review and Site Plan review.

205. The fact that the entire Special Permit renewal "process" conducted by the Planning Board was "irregular" from its inception is evidenced, *inter alia*, by Defendants' failure to even come close to meeting the statutory public hearing deadline on December 10, 2012.

C&F: 2202077.42

43

206. Pursuant to New York State Town Law and Defendant Town's own Zoning Law, Defendants were legally obligated to issue a decision on Dragon Springs' Renewal Application sixty-two days after the commencement of a December 10, 2012 public hearing thereon, *i.e.*, no later than February 10, 2013.

207. Here, however, Defendants failed to commence a public hearing on Dragon Springs' Renewal Application until May 8, 2013, a full 211 days after Dragon Springs filed its Renewal Application, and more than three times the maximum statutorily mandated sixty-two day timeframe.

208. That Defendant Planning Board has further failed to follow state law or its own Zoning Law by to-date by not issuing any decision on Dragon Springs' Renewal Application.

209. At this time, Defendants are still in the process of "reviewing" Dragon Springs' Renewal Application <u>ten</u> months after it was filed.

210. Defendants' actions herein have substantially burdened Dragon Springs' rights, *inter alia*, under RLUIPA by failing, as required by the terms of the 2006 Resolution, to review the Renewal Application administratively and grant Dragon Springs a renewed Special Use Permit immediately and automatically upon receipt of the Town Building Inspector's Certification.

211. Defendants also substantially burdened Dragon Springs' rights by adopting the Town Engineer's *ultra vires* and void determination that Dragon Springs should be compelled to undergo a "Site Plan modification" and "Special Use Permit modification and time period."

C&F: 2202077.42

212. In this illegal and *ultra vires* "proceeding" Defendants further burdened Dragon Springs' rights by utterly failing (indeed, intentionally delaying) the commencement of a public hearing on Dragon Springs' Renewal Application by over 200 days, demonstrating that Defendants' entire proceeding was and is a sham, motivated solely by their avaricious desire to exact "community benefits" from Dragon Springs.

213. Defendants have additionally burdened Dragon Springs' rights by failing (in fact refusing Dragon Springs' repeated demands) to issue a decision on its Renewal Application.

### Dragon Springs' Pending Redundant Site Plan Application

214. The extreme prejudice of Dragon Springs' rights with respect to the processing and "review" of the Renewal Application, as set forth hereinabove, extends to Defendants' adoption of the Town Engineer's *ultra vires* determination that Dragon Springs submit a "Site Plan modification," in which void proceeding Defendants have compelled Dragon Springs' participation.

215. In furtherance of this unlawful and compelled procedure, Dragon Springs submitted its Redundant Site Plan Application on January 2, 2013.

216. Incredibly, Defendant Planning Board's sole reason for compelling the Redundant Site Plan Application was for the absurd purpose of labeling and affixing the name of the religious school facilities to the Site Plan drawings already approved by Defendant Planning Board in 2011.

217. The drawings approved by Defendant Planning Board in 2011 (a year after Dragon Springs filed that application) are the same drawings that prominently display on

45

C&F: 2202077.42

their face a "Cafeteria & Educational Building" and include, *inter alia*, "Dancing Classroom[s]," "Music Classroom[s]," "Study Rooms," a "Music Practice Room," the "Approved Library," "Dormitory" facilities, a "Stage," and a "Teacher's Office."

218. The Town Engineer's Certification even confirmed that there had not been a single substantive change from the previously approved Site Plan, under which numerous buildings and educational facilities had been lawfully constructed pursuant to Building Permits and occupied per Certificates of Occupancy, with which Dragon Springs was operating in full compliance.

219. Under New York State Town Law, a "site plan" is:

> [A] rendering, drawing, or sketch prepared to specifications and containing necessary elements, as set forth in the applicable zoning ordinance or local law, which shows the arrangement, layout and design of the proposed use of a single parcel of land as shown on said plan.

N.Y. Town Law § 274-a(1) (McKinney) (emphasis added).

220. That under New York State Town Law, Defendant Planning Board lacks authority to conduct site plan "review" for existing uses:

> Site plans shall show the arrangement, layout and design of the proposed use of the land on said plan.

N.Y. Town Law § 274-a(1) (McKinney) (emphasis added).

221. That Article 7 of the Town Zoning Law recognizes that Defendants' site plan review authority is coterminous with New York Town Law § 274-a.

222. In the case at bar there was and is no statutory basis for Defendant Planning Board's Site Plan review under New York Town Law § 274-a.

223. That accordingly, Defendants' pending Site Plan review process is *ultra vires* and *void ab initio.*

C&F: 2202077.42

224. Defendants thus commenced full Special Use Permit and Site Plan review of Dragon Springs' Application, which continues to the date hereof, despite the fact that Defendants knew that there had been no change in Dragon Springs' proposed use or occupancy of the Property or the number, dimensions or location of any structure on the Property.

225. That at all times, Defendant Planning Board's authority to conduct lawful Site Plan review was coterminous with the provisions of New York State Town Law § 274-a.

226. That New York State Town Law § 274-a required Defendants to commence a public hearing within sixty-two days of Dragon Springs' filing of its complete Redundant Site Plan Application, and to then issue a decision within sixty-two days from the close of the public hearing. *See also* Town Zoning Law § 230-47 (incorporating same timeframe).

227. Because Dragon Springs filed its Redundant Site Plan Application on January 2, 2013, Defendants were legally obligated under the New York State Town Law and the Town Zoning Law to commence a public hearing no later than March 4, 2013.

228. Defendants nevertheless egregiously failed to notice and commence a public hearing on Dragon Springs' Redundant Site Plan Application by March 4, 2013, as required by both New York State Town Law § 274-a and Section 230-47 of the Town Zoning Law.

229. Pursuant to New York State Town Law and Defendant Town's own Zoning Law, Defendants were further legally obligated to issue a decision on Dragon Springs'

47

Redundant Site Plain Application sixty-two days after the close of a March 4, 2013 public hearing thereon, *i.e.*, no later than May 6, 2013.

230. Here, however, Defendants failed to commence a public hearing on Dragon Springs' Redundant Site Plan Application until May 8, 2013, a full 126 days after Dragon Springs filed its Redundant Site Plan Application, and more than twice the maximum statutorily mandated sixty-two day timeframe.

231. That on May 8, 2013, Defendant Planning Board went as far as to designate itself "Lead Agency" for SEQRA review regarding the Redundant Site Plan Application, when all such proceedings thereon, including Defendants' SEQRA review are unlawful and void.

232. That notwithstanding Defendants' void proceeding, Dragon Springs' Redundant Site Plan Application, and indeed all permit renewals, are Type II exempt from review under SEQRA.

233. Defendant Planning Board's determination in compelling the submission of the Redundant Site Plan Application and dilatory *ultra vires* review thereof unmistakably demonstrates that Defendants' obstruction of Dragon Springs' religious use of the Property and burdening thereof, which has been continuous for well over a decade, will continue permanently unless enjoined and their misconduct adequately redressed herein.

234. Defendants' present and ongoing requirement that Dragon Springs pay for and engage in these prolonged municipal review processes in exchange for a no longer applicable renewed Special Use Permit and an unnecessary Site Plan approval, when there has been no change in Dragon Springs' proposed use or occupancy of the

48

C&F: 2202077.42

Property, unlawfully regulates and seeks to dictate virtually all of the internal operational details and pedagogy of Dragon Springs' appurtenant educational use permitted as of right in a Place of Worship under the Town Zoning Law, the ZBA Decision, and as approved by Defendants in the 2006 Resolution and the 2011 Site Plan approval.

235. Dragon Springs' use of the Property – including its religious educational use – is consistent with the 2006 Resolution insofar as the educational activities conducted at the site are a lawfully permitted use to "worship by monks of the Buddhist School and other Buddhist School practitioners residing at and/or visiting the site," and part and parcel of a Place of Worship.

236. Dragon Springs essentially had no choice but to comply with Defendants' coercive demand that it participate in Defendants' review of a "Site Plan modification" and "Special Use Permit modification and time period."

237. In protest of these unlawfully imposed "processes," however, Dragon Springs submitted a Memorandum to Defendant Planning Board, dated January 18, 2013, challenging its conclusion that Dragon Springs' use of the Property for "a school and college" somehow requires additional approvals from Defendants, stating:

> [T]he reason to have educational facilities at Dragon Springs is to further our religious purposes. These educational facilities are established entirely for the young Falun Dafa practitioners. They study Falun Dafa books daily. They practice Falun Dafa's five sets of exercises daily. Their main purpose is to spread Buddha Law in the world through religious performing arts, playing the role similar to missionaries.

238. In its January 18, 2013 Memorandum to Defendant Planning Board, Dragon Springs further advised that:

 (i)  Defendants had previously approved every building on the Property; and

C&F: 2202077.42

(ii)    There had been no change in Dragon Springs' use of the Property since the 2006 Resolution, to wit: "the use and purpose have always been religious."

239. Dragon Springs also informed Defendant Planning Board that the educational facilities at the Property exist to prepare Dragon Springs' worshippers and practitioners "for advance studies so they can better serve their role of spreading the Buddha Law."

240. Nonetheless, ten months after Dragon Springs filed its Renewal Application and eight months after Dragon Springs filed its Redundant Site Plan Application, Defendants continue to persist in requiring Dragon Springs to submit to these processes, which further require payment of application fees and the expenditure of valuable time and money by Dragon Springs, which unlawfully burdens Dragon Springs and diverts its resources from its religious purpose and activities.

### The Zoning Amendment Reclassifying
### Dragon Springs' Place of Worship As A Principally Permitted Use

241. On March 25, 2013, during the pendency of Dragon Springs' Renewal Application, the Town amended its Zoning Law to provide that a Place of Worship, like Dragon Springs herein, is a principally permitted use in the RR Zoning District. Therefore, worship at Dragon Springs is no longer subject to annual renewal of its Special Use Permit as previously imposed by Defendants.

242. Notwithstanding the Zoning Amendment, Defendants absurdly contend that Dragon Springs remains subject to annual Special Use Permit review and renewal as a condition of its worshippers' legal rights to continue to worship at the Property, thereby disregarding their own dramatic change of zoning law, and their own counsel's acknowledgement that such could not legally be required, and Defendant Town Supervisor's identical confirmation to Dragon Springs.

C&F: 2202077.42

243. The foregoing indefensible action is further evidence of Defendants' dilatory, unlawful and discriminatory actions herein.

244. That it is a matter of basic zoning law and procedure that Defendant Planning Board cannot require Dragon Springs to obtain a renewed Special Use Permit for a principally permitted use as of right and all uses appurtenant to that principal use, and hence, its conduct herein is a violation of the authority expressly delegated to Defendant Planning Board by New York State Town Law.

245. That despite Defendant Planning Board's knowledge of its limited authority, Defendant Planning Board by virtue of its *ultra vires* actions has constantly discriminated against Dragon Springs and severely impacted Dragon Springs' members' ability to practice and develop their faith freely by repeated unconscionable, disrespectful and totally irrelevant inquiry into and questioning of Dragon Springs' religious use as a Place of Worship.

246. That Dragon Springs' use as a Place of Worship, as guaranteed by the ZBA Decision, includes "a church school building," and that Dragon Springs' facilities, as approved by Defendants in the ZBA Decision, 2006 Resolution and 2006 and 2011 Site Plan approvals, include multi-building educational facilities.

247. In fact, at Defendant Town Board's meeting on March 25, 2013, wherein it adopted the Zoning Amendment, the Town Engineer (whose private firm drafted the Town Zoning Law) admitted that the amended Town Zoning Law:

> [T]hey have no area that specifically states that a school or college can be in any one particular or not. They have language that a public building can be in pretty much any zone and that includes a public school. It didn't include private school and he would take the boards [sic] direction if that should be added as a special use in any or all districts.

C&F: 2202077.42

248. That notwithstanding the foregoing, Defendant Town Board voted to adopt the Zoning Amendment on March 25, 2013 without further discussion or amendment to regulate a private religious school.

249. Accordingly, a private religious school at a Place Of Worship like the existing one at Dragon Springs is not subject to further Planning Board "regulation," i.e., Defendants' unlawfully "mandated" Site Plan review of private religious education at Dragon Springs.

250. That Defendants were accordingly on actual notice that the private religious schools at Dragon Springs, a Place of Worship, were not subject to their "regulation" pursuant to their unlawfully coerced and still "pending" Site Plan review.

251. On April 9, 2013, Defendant Town Supervisor represented to Dragon Springs that the Zoning Amendment automatically made Dragon Springs' Place of Worship a permanent principally permitted use as of right.

252. Next, despite the Zoning Amendment, Defendant Planning Board held a public hearing on Dragon Springs' Renewal Application on May 8, 2013.

253. At the May 8, 2013 meeting, Defendants Vicaretti and Derek Wilson cut public comment in favor of Dragon Springs short, in contrast to the latitude granted to the local community to object to Dragon Springs' tax exemption.

254. At the May 8, 2013 meeting, despite Dragon Springs' numerous representations to Defendants that there was no proposal for new construction at the Property, and the Town Engineer's own conclusion that Dragon Springs was in compliance with all of Defendants' prior approvals, Defendant Derek Wilson

C&F: 2202077.42

disingenuously represented that the Planning Board was "considering" whether "a school can or can't be built up there."

255.  That Defendant Planning Board does not have the legal authority to interpret the Town Zoning Law or to determine or "consider" whether Dragon Springs' existing appurtenant educational facilities are subject to a Special Use Permit or Site Plan Review, as referenced by Defendant Derek Wilson hereinabove.

256.  That Defendants' actions in requiring Site Plan review for the previously approved Temple, where there was no change in the Temple as approved, are unlawful, *ultra vires* and *prima facie* discriminatory.

257.  At the May 8, 2013 public hearing, Dragon Springs' representative again advised Defendant Planning Board that:

> [W]e're here for site plan approval and an application for a continuance of a special use permit. We have the maps that we submitted before, and the new plans have no new buildings or improvements or anything. All of the buildings and site plan revisions, including educational facilities, classrooms, and study rooms have previously been approved. We're not proposing anything new, no new buildings. However, at this time, we're having our public hearing and this application here today, because pursuant to discussion and understanding it is good for us to also include the school needs which we have right now, on the site plan now. So, we have a hearing now. But all of the buildings are on the plan, there's nothing new.

(Emphasis added).

258.  Nevertheless, Defendants required Dragon Springs to submit a "new" Site Plan for review and approval that included nothing more than what Defendants approved in their 2006 and 2011 Site Plan approvals, with the absurd exception of labels of the name of the Dragon Springs appurtenant educational uses.

C&F: 2202077.42

259. At the May 8, 2013 public hearing, Defendant David M. Dean revealed Defendants' true motive:

> I have a question. The last time you were here, I suggested to you that the [T]own [B]oard was interested to know, <u>and another reason for the site plan here</u>, was to ascertain <u>future plans</u> for gatherings, traffic control, <u>maintaining the roads</u>, and I was hopeful that this public hearing would offer some that [sic] information.
>
>            \*        \*       \*
>
> And, quite frankly, <u>I'm going to come to you, and say, 'look, if we're going to provide this service, we're going to have to ask you to help out to pay for some of this.'</u> So, I mean, I was hoping to see some of that, <u>and that's why I'm so passionate about asking you to come to do this</u>, to do a site plan, to give us some information.

(Emphasis added).

260. Thus, Defendant David M. Dean volunteered that the real purpose of Defendants' requirement for their continued review of the Renewal Application after the Zoning Amendment (without any legal authority to do so) was and is to conduct an inquisition into Dragon Springs' lawfully permitted use of the Property in an attempt to exact concessions from Dragon Springs about speculative possible "future plans."

261. As stated by Defendant David M. Dean, openly and publicly, "I'm so passionate about asking you to come to do this" because Defendants are "concerned about "maintaining [Town] roads" – "[L]ook, if we're going to provide this service, we're going to have to ask you to pay for some of this."

262. That at the May 8, 2013 public hearing on, *inter alia*, Dragon Springs' Renewal Application, when Defendant David M. Dean asked that Dragon Springs' Special Use Permit "not be extended at this time" until both Defendants Planning Board and Town Board were provided with some vague declaration by Dragon Springs of the

C&F: 2202077.42

"future plans" it allegedly has for the Property, even one Planning Board member recognized how utterly improper it was to withhold approval of the Renewal Application on this illusory basis, declaring:

> I understand your concern Dave, but they may not know what they want to do, and I don't know how that's particularly relevant to this application. . . . and I don't think we should hold them up for a discussion.

(Emphasis added).

263. That on May 8, 2013 as Defendant Planning Board continued to delay Dragon Springs with irrelevant inquiries about possible future growth, Dragon Springs, exasperated with the speculation and delay premised upon "maybes" and "possibilities," finally demanded that Defendant Planning Board simply issue the long overdue renewed Special Use Permit for its Place of Worship (the "First Demand") declaring:

> It is a religious place, the temple, it's a religious temple. We look at a big huge temple, you know, it's a big building, a religious temple, there's one Buddha sitting in there, like a Buddha statue, no-one occupies it, you know, it's huge. It's an expression of respect, and it gives a person a serenity to connect with this huge space. So, it is religious, and we want to keep it peaceful and spiritually enriching, in this beautiful environment. So, with the buildings and all these other places, there's not that many people there now. . . . This Special Use Permit has been pending for very long, and it's not like the temple will go away, we are using it. We would like this to get approved as soon as possible . . . that is our position.

264. Dragon Springs, its use as a Place of Worship and all uses "customary, incidental and/or appurtenant" thereto no longer being subject to the requirement for a Special Use Permit by operation of law, thus made its First Demand that Defendant Planning Board acknowledge that renewal was no longer necessary, *i.e.*, that the continuation of their review of the Renewal Application was superfluous and moot.

C&F: 2202077.42

265. Defendants nevertheless <u>refused</u> Dragon Springs' First Demand and, in bad faith, compelled Dragon Springs to continue the completely unnecessary, *ultra vires*, and costly review of the Renewal Application, while also mandating that Dragon Springs submit to an equally unnecessary "Amended Site Plan" application.

266. After Defendant Planning Board's May 8, 2013 public hearing, Dragon Springs' President (who is a professional engineer) met with Defendants on May 20, 2013, at which time Defendants Town Supervisor and David M. Dean made clear that Defendants were demanding compensation from Dragon Springs.

267. In a May 28, 2013 letter to Defendant Planning Board, Dragon Springs' President then reaffirmed its demand that Defendant Planning Board issue the long overdue renewed Special Use Permit for its Place of Worship (the "Second Demand") stating:

> On May 20, I met with Town Supervisor Mr. Karl Brabanec and Councilman Mr. David Dean regarding possible future amendment of Dragon Springs site plan <u>in connection with the Town's economic growth strategies</u> and the neighboring Da Tang developments. <u>After discussion and considerations, no amendments are needed at this moment. Therefore, there are no open issues in Dragon Springs site Plan Review.</u>
>
> Dragon Springs is in the RR zone. The new zoning law defines "Places of Worship" in the RR zone as a Principal Permitted Use. We therefore request the Planning Board to approve the use permanently in consistent with the new zoning law.

(Emphasis added).

268. Thereafter, on July 9, 2013, the Town Engineer actually reduced to writing Defendants' intention to exact a cash payment from Dragon Springs in exchange for their "approval," declaring:

C&F: 2202077.42

56

> [W]e believe an agreement for road repair should be worked
> out with [Dragon Springs] as part of the special use permit
> process.

269. At a Planning Board meeting on July 10, 2013, Dragon Springs, on the

record, <u>again</u> demanded immediate approval of its Renewal Application and Site Plan

approval based on the fact that there clearly was:

> [N]o new proposal for the existing site plan construction
> plans, no new development . . . .

and that Dragon Springs:

> [J]ust wants to keep it as a place of worship.

270. Defendants' habitual patronization of Dragon Springs continued at this

meeting, with Defendant Schock ridiculously suggesting that Dragon Springs

worshippers "should be good neighbors to the people on Galley Hill Road."

271. At this same meeting, Dragon Springs' counsel and representative made its

third demand (the "Third Demand" or "Final Demand") on the record as follows:

> She said that with a special use permit, her clients' position
> is that given the context of the new zoning law, and the
> special use permit renewal has been done every year, she
> would like to request a permanent special use permit, which
> is in the Planning Board's power to do that. She said that
> there are other ways that the town can enforce its' [sic]
> powers to oversee the construction of Dragon Springs, and
> with the commercialization anticipated with the Da Tang
> development later, there are laws that they have to comply
> with and conform.
>
> She said that Dragon Springs has no new proposal for the
> existing site plan construction plans, no new development,
> and wants to keep it as a place of worship. She said that it
> is a meditative place, and visitors would be limited. She
> respectfully asked for a permanent special use permit.

C&F: 2202077.42

272.  Notwithstanding the fact that:  (i) Dragon Springs was legally entitled to an automatically renewed Special Use Permit at the time that it filed its Renewal Application; and (ii) that the Zoning Amendment obviated the need for any permission from Defendants for Dragon Springs' continued use of the Property as a Place of Worship, Defendants ignored Dragon Springs' First Demand, Second Demand and Final Demand, and continued (and continues) to compel Dragon Springs to submit to these unnecessary and *ultra vires* proceedings.

### Defendants' Attempted Exaction Of A Cash Payment For "New Roads" As A Condition Of Approval Of Dragon Springs' Renewal Application And Equally Unlawful Site Plan Review

273.  That consistent with Defendants' constant public criticism of Dragon Springs' status as a § 501(c)(3) tax exempt non-profit religious institution, which does not pay real estate taxes to the Town, Defendants, acting pursuant to what has become a Town policy under color of law, have repeatedly attempted to compel Dragon Springs to pay "taxes" in one form or another.

274.  In this context, Defendants' insistence, after the Zoning Amendment, that Dragon Springs pursue Special Use Permit renewal (which, in any event, was subject to automatic renewal) and Planning Board approval of an equally unnecessary "amended" Site Plan can only be viewed as a deliberate, punitive pretext for a process by which Defendants could again attempt to exact financial benefits from and extort Dragon Springs.

275.  That Defendants' actions in continuing to compel Dragon Springs to comply with a superfluous and unlawful administrative process is part of a larger pattern of animus, delay, and attempted exactions from Dragon Springs spanning over a decade.

C&F: 2202077.42

276. On July 9, 2013, Defendants attempted to exact a cash payment from Dragon Springs to pay for certain "new roads" in the Town, as a "condition precedent" to Defendants' unnecessary approval of Dragon Springs' Application.

277. That Defendants would never have demanded the same from anyone else under the circumstances, let alone from what Defendants perceive as mainstream religious, tax-exempt owners of property in the Town or local applicants.

278. Defendants' intention has been specific, transparent, and public, as evidenced by the Town Engineer's recommendation to Defendant Planning Board Chairman that:

> We believe that any agreement for road repair should be worked out with the applicants as part of the special use permit process.

279. That during a routine inspection of Dragon Springs' Property on July 18, 2013, the Town Engineer outrageously informed Dragon Springs' President that all of Dragon Springs' "problems" with the Town (*i.e.*, Defendants' refusal to conclude the Renewal Application and Site Plan review notwithstanding the First Demand and Second Demand) could be settled by a $150,000 lump sum cash deposit into a Town bank account.

280. In fact, during his routine inspection on July 18, 2013, the Town Engineer made specific reference to a bank located nearby in Port Jervis, New York, where the $150,000 payment could be deposited for Defendant Town's benefit.

281. That this most recent exaction demanded is consistent with a pattern of similar attempts to "tax" Dragon Springs, including before the 2006 Resolution, where Defendants, acting under color of law pursuant to essentially accepted Town policy,

C&F: 2202077.42

unsuccessfully attempted to coerce Dragon Springs into purchasing expensive fire equipment and the construction of a building to house same (at a cost that could have exceeded $1,000,000) for the Town, despite the absence of any nexus between Dragon Springs' project and this equipment generally desired by the Town.

282. That Defendants' attempted exaction of a $150,000 cash payment for "new roads" as a condition of approval for Dragon Springs' Renewal Application and Redundant Site Plan Application, coupled with Defendants' past attempts to exact financial concessions from Dragon Springs and innumerable discriminatory comments historically made by several Town officials, and by members of the incited public, who were so encouraged by Defendants at Planning Board meetings and public hearings concerning Dragon Springs, further and dispositively demonstrates Defendants' discriminatory animus and bad faith intent to injure Dragon Springs.

283. That Dragon Springs, in a gesture of good faith and out of a desire to resolve differences with Defendants, even voluntarily considered absorbing the reasonable cost of road repair desired by Defendant Town so the parties could move forward together in a collaborative and amicable fashion.

284. That even the foregoing voluntary offer by Dragon Springs was insufficient for Defendants, who adamantly and avariciously insisted that Dragon Springs pay for the far more costly new, "upgraded" roadwork and not merely repairs, as the "price" for approval of Dragon Springs' "automatic" and no longer necessary Renewal Application.

285. That Defendants' demand from Dragon Springs of a $150,000 lump sum cash payment for "new roads" represents an unconstitutional condition on a land use

C&F: 2202077.42

permit and, further, that such an exaction is a covert "tax" on a lawfully tax-exempt religious organization.

## Defendants' Repeated Discrimination Against Dragon Springs

286. Defendants' consistent and malicious prosecution of an intentional campaign to deprive Dragon Springs and its worshippers of their constitutionally protected rights through a concerted scheme of selective treatment and enforcement of the Town Zoning Law, by the *sui genesis* creation of non-existent "rules" applied only to Dragon Springs, particularly as compared with others who Defendants never so abused and whose land use applications were approved virtually overnight with little to no significant burden or impediment, violates Dragon Springs' rights under the United States Constitution and RLUIPA.

287. Defendants' most recent discrimination involves their unlawful and coercive efforts to compel Dragon Springs to comply with full municipal review of its Renewal Application for Dragon Springs' previously approved use that the Zoning Amendment now permits as of right, and compelling Dragon Springs to submit to full Site Plan review despite the indisputable fact that Dragon Springs has not proposed to modify any structure in any way or proposed any new use.

288. That, upon information and belief, Defendants never took similar actions in the recorded history of the Town against what Defendants perceive as other mainstream religious organizations and uses, and/or local applicants.

289. Thus, Dragon Springs, as compared with others similarly situated, was selectively treated by Defendants in violation of Dragon Springs' constitutional right to equal protection, and such selective and unequal treatment continues to this day.

C&F: 2202077.42

290. That the current ten month (and counting) delay in granting Dragon Springs' Renewal Application, which Defendant Planning Board's own 2006 Resolution adopting the permit states "shall be automatically renewed," further evidences Defendants' avarice and unequal application of the law to delay approval of Dragon Springs' Renewal Application as well as their abridgment of Dragon Springs' freedom of religious exercise and use of the Property.

291. That Defendants impermissibly continue to subject Dragon Springs to this burdensome and costly process even after the Town's adoption of the Zoning Amendment providing that Dragon Springs' use as a "Place of Worship" is now a principally permitted use as of right in the RR Zoning District and no longer subject to Special Use Permit regulation, notwithstanding the First Demand and the Second Demand, respectively.

292. That Defendant Planning Board blatantly disregarded the normal, reasonable and established legal time frames as well as any recognition of any need to conclude their "administrative review process" of Dragon Springs' Renewal Application in a reasonable time frame (even despite the First Demand, Second Demand and Final Demand) so that it could coerce "agreement" by Dragon Springs to their desired exaction in lieu of the real property tax exemption that Dragon Springs enjoys as a Place of Worship.

293. That while proof of a civil rights violation can almost never depend upon an open statement of an intent to discriminate, and it is enough if local officials are effectuating the discriminatory designs of private parties, in the case at bar, Defendants' past and present public treatment of Dragon Springs evidences the kind of open

C&F: 2202077.42

discrimination that is typically missing from actions asserting, *inter alia*, Fourteenth Amendment violations.

294. That Defendants' pretextual, selective, and discriminatory assertions were maliciously motivated and undertaken in bad faith to inhibit and deter the exercise of constitutionally protected rights by Dragon Springs, its worshippers, and followers of Buddhism.

295. By way of illustration, in his January 3, 2013 correspondence to Defendant Planning Board, the Town Engineer stated that a "Site Plan modification" and "Special Use Permit modification and time period" was necessary because "Originally we felt that the classrooms, library, etc. (all of which religious educational facilities were approved 7 years ago in the 2006 Resolution) was for religious purposes (i.e., Sunday School);" a statement in which Defendants essentially concede that a Sunday School is an acceptable "religious purpose." Based thereupon, the Town Engineer mystifyingly concluded that Dragon Springs' educational mission to teach religious and traditional performing arts skills in keeping with Buddhist School tradition is unacceptable and irreligious thereby somehow now justifying "new" Site Plan or Special Use Permit review.

296. That any claimed rational basis proffered by Defendants for the abundance, frequency and totality of differences in treatment of Dragon Springs compared to all other applications in Defendant Town between 2001 and the date hereof is an illegitimate pretext intended to shield Defendants' discriminatory motive and intent.

297. In addition, the Constitution confers upon Dragon Springs the right to pursue specially permitted and site plan land use approvals without exposure to public ridicule

C&F: 2202077.42

by slanderous and demeaning racially charged comments which, *inter alia*, challenged the integrity of Dragon Springs' religious purposes, objected to any children of Dragon Springs' followers attending local schools or living on site, and impermissibly and unconstitutionally singled out Dragon Springs' tax exempt status locally as a "rally the troops" mechanism of inciting racial animus on the part of the public and other municipal officials against Dragon Springs. An Addendum that enumerates several of Defendants' racially charged, discriminatory comments and actions is annexed hereto as Exhibit B.

298. The discrimination by Defendants herein is all the more egregious given the long history of persecution suffered by the Falun Dafa religious worshipers and practitioners in China. A separate Addendum prepared by Dragon Springs concerning this historic tragedy and further Background of Dragon Springs and Falun Dafa is annexed hereto as Exhibit C.

299. The frequency with which Dragon Springs was subjected to racially charged comments and disparate treatment as compared to other similarly situated or comparable religious and mainstream secular applicants creates striking and irrefutable evidence of religious animus, malice and discriminatory intent.

300. Through the actions and the discriminatory conduct described herein, Defendants have, under color of law and in bad faith, attempted to delay and prevent Dragon Springs from being able to use (at the proper cost to Dragon Springs) its various permitted religious structures fully, with the intent that they "sit" with little use by Dragon Springs' worshippers and followers by virtue of the Population Limitation, thereby denying the full, fair, and timely use thereof to Dragon Springs and its religious practitioners.

C&F: 2202077.42

301. Despite the special status under RLUIPA that Defendants were legally required to afford Dragon Springs, Defendants took it upon themselves to obstruct Dragon Springs for reasons that became self evident – Defendants did not want what they viewed as a minority race and non-mainstream religion in their backyard, exempt from local taxes, without at least exacting substantial sums of money from Dragon Springs in lieu of the real estate and local taxes they were unable to directly impose on Dragon Springs.

302. The relatively smooth application processes of other similarly situated groups and other similarly or comparably situated property owners in Defendant Town (such as, *inter alia*, the YMCA application to add a lodge for forty-four additional persons, approved with no resolution in two weeks), stands in marked and disturbing contrast to Dragon Springs, who is now in its twelfth year of struggling with the arbitrary, capricious and illegal demands of Defendants (which have burdened and diverted the resources of Dragon Springs), whose primary goal has been to thwart, rather than facilitate, Dragon Springs' use of the Property and worship at the Temple.

303. That Dragon Springs has incurred substantial attorneys' fees in challenging the legality of Defendants' multitudinous illegal actions, including the present unlawful actions complained of herein and those with respect to the aforementioned 2006 Resolution.

304. That, in the past, after the intervention of counsel, in many instances Defendants changed their tactics and went on to adopt a different approach as part and parcel of Defendants' continuing pattern of delay and selective discriminatory actions.

C&F: 2202077.42

305. That Dragon Springs cannot be forced to commence legal action every time Defendants act illegally and unconstitutionally to delay, hinder, burden and interfere with Dragon Springs' religious use of the Property and its members' free exercise of their religious faith.

306. That Defendants' egregious actions herein and complete disregard of both the First Demand and Second Demand regrettably establish that without repeated litigation or permanent relief herein, Defendants will continue to discriminate and, in bad faith, seek to injure Dragon Springs.

307. By conducting the Dragon Springs' land use review process in a discriminatory, unauthorized and illegal manner, and by the conduct alleged herein, including but not limited to Defendants' unlawful demands that excessive monetary exactions or covert "taxes" be paid by Dragon Springs, the aforesaid incessant barrage of illegal conditions and restrictions imposed by Defendants, and the Hobson's Choice constantly imposed on Dragon Springs throughout; to wit: constantly commence litigation to overturn each and every illegal action – or – at tremendous cost and delay "wade" as best as they can through Defendants' illegal, *ultra vires* "processes" in order to use and worship at its Place of Worship, always hoping that the most recent illegal act would be the last, Defendants have denied and presently deny to Dragon Springs equal protection of the laws.

308. That compelling Dragon Springs to pursue its legal remedies every time Defendants violate, *inter alia*, RLUIPA, will drain Dragon Springs' resources and further delay Dragon Springs exactly as Defendants desire.

C&F: 2202077.42

309. As set forth herein, Defendants' dilatory tactics, Defendants' discriminatory actions in imposing illegal demands and exorbitant costs upon Dragon Springs in the application process and in raising frivolous and arbitrary objections to Dragon Springs' applications, particularly in contrast from applications by what Defendants view as mainstream religious and secular institutions and other mainstream local property owners, their continuance of an illegal and *ultra vires* administrative process, and Defendants' demand for an exaction as a condition of approval of the Renewal Application and "new" Site Plan review constitute a flagrant indifference to Defendants' obligations, *inter alia*, under RLUIPA, which prohibits a governmental entity from applying a land use regulation:

> [I]n a manner that imposes a substantial burden on the religious exercise of a person . . . or institution, unless the government demonstrates that the imposition of the burden on that person . . . or institution is in furtherance of a compelling governmental interest; and . . . [the burden imposed] is the least restrictive means of furthering that compelling governmental interest.

310. On a continuing basis, Defendants have selectively enforced governmental regulations against Dragon Springs as compared with others similarly situated.

311. Defendants' selective treatment has been motivated by an intent to discriminate on the basis of race and/or religion and drain Dragon Springs' resources.

312. Defendants' discrimination has been in furtherance of Defendants' efforts to punish or inhibit the exercise of Dragon Springs' constitutional rights and limit "their" population in the Town.

67

C&F: 2202077 42

313. Defendants have violated Dragon Springs' constitutional right to equal protection of the laws pursuant to a malicious and/or bad faith intent to injure and have, in fact, caused substantial injury to Dragon Springs.

314. That with regard to Defendants' equal protection violations, there was no rational, let alone compelling, basis for the difference in treatment accorded to Dragon Springs.

315. That, *inter alia*, Defendant Planning Board continues to question despite the clear absence of such authority - in disrespectful and discriminatory terms - whether Dragon Springs' use was and continues to be a bona fide religious use, long after the ZBA Decision's conclusive, final and binding finding that it was such a religious use protected by, *inter alia*, RLUIPA.

316. That many Planning Board meetings and public hearings were prolonged and repeatedly adjourned and continued for months, at unnecessary, great cost and damage to Dragon Springs, pursuant to discussions and "inquiries" about zoning compliance and other issues having no relation to the proper authority and scope of Defendant Planning Board's review of Dragon Springs' applications, including without limitation its pending Renewal Application.

317. That after the Zoning Amendment established Dragon Springs' use as a "Place of Worship" in the RR Zoning District as a principally permitted use as of right, Defendant Planning Board had no lawful authority to continue to subject Dragon Springs to an arbitrary and *ultra vires* administrative review process.

318. That unless enjoined from continuation of this longstanding pattern of Constitutional violations, Defendants may well succeed in draining Dragon Springs'

C&F: 2202077.42

resources, and permanently limiting the religious use of Dragon Springs' 427 ± acre Property and all of its previously approved buildings, for which Certificates of Occupancy have been duly issued, to an arbitrarily and artificially low number of worshippers in violation of the United States Constitution, RLUIPA, and other rights and freedoms enjoyed by Dragon Springs and its worshippers under federal and state law.

## FIRST CLAIM FOR RELIEF

### For Violation Of RLUIPA
### By Virtue Of Defendants' Discrimination

319.  Dragon Springs respectfully repeats and realleges all prior allegations of the Complaint with the same full force and effect as if set forth at length and verbatim.

320.  Defendants, acting in their capacity as governmental entities and/or agents, imposed land use regulations upon Dragon Springs.

321.  That these land use regulations imposed and continued to impose substantial burdens on Dragon Springs and its worshippers' religious exercise.

322.  Defendants imposed substantial burdens on Dragon Springs in the implementation of a land use regulation or system of land use regulations, under which Defendant governmental entities and agents make, or have in place, formal and/or informal procedures and/or practices that permit Defendants to make individualized assessments of the proposed uses for the property involved.

323.  Defendants imposed and/or implemented land use regulations in a manner that discriminates against Dragon Springs on the basis of its religion and/or religious denomination, and further exceeded their lawful authority in order to compel concessions from Dragon Springs and impose burdensome restrictions in connection with Defendants' land use permitting process.

C&F: 2202077.42

324. Defendants' arbitrary, capricious, and unlawful imposition and implementation of the Town Zoning Law discriminated against Dragon Springs and its worshippers on the basis of religion and religious denomination in contrast from what in Defendants' view are, *inter alia*, other mainstream religious institutions or local applicants, to wit:

(i) By continually exceeding the lawful and limited authority of a Planning Board since the ZBA Decision;

(ii) By a continuous pattern of demeaning, derogatory and humiliating public discriminatory comments by Town officials acting under color of law pursuant to accepted Town policy;

(iii) By continuous illegal actions utilized as pretextual bases for delaying review of Dragon Springs' land use permit applications and the imposition of extraordinary costs;

(iv) By the coercion of Dragon Springs' "agreement" to illegal and unreasonable conditions of approval for land use permits, including without limitation, the Population Limitation, Child Residency Ban, and Annual Renewal Condition;

(v) By refusing to review administratively and automatically grant Dragon Springs' Renewal Application in violation of the terms of the Annual Renewal Condition;

(vi) By failing to conduct promptly the inquisitive inspection of Dragon Springs' Property and Temple by the Town Building Inspector in accordance with the Annual Renewal Condition by approximately three months in utter disregard of Dragon Springs' entitlement to automatic approval of its Renewal Application upon inspection;

(vii) By failing to grant a renewed Special Use Permit in accordance with the Renewal Application and Annual Renewal Condition administratively and automatically promptly upon receipt of the Town Engineer's Certification that Dragon Springs was in compliance with all of Defendants' approvals;

(viii) By adopting the *ultra vires* Town Engineers' Certification determining that full Special Use Permit and Site Plan review were required, and improperly commencing formal Special Use Permit proceedings in violation of the Annual Renewal Condition;

(ix) By illegally compelling Dragon Springs to submit its Redundant Site Plan Application containing no substantive changes whatsoever from the Site Plan drawings approved by Defendants on April 29, 2011, and unlawfully conducting review thereof, including making an unnecessary and unlawful

C&F: 2202077.42

determination of lead agency status for the purposes of SEQRA, in complete disregard of the New York State Town Law, SEQRA, and the Town Zoning Law;

(x) By pretextually contriving a "basis" for the illegally compelled Redundant Site Plan Application for the absurd and meaningless purpose of affixing the names of the religious educational facilities previously approved by Defendants in earlier site plans, including in particular the 2011 Site Plan, which was made for the express purpose of educational facilities and included, on its face, a "Cafeteria & Educational Building" and "Dancing Classroom[s]," "Music Classroom[s]," "Study Rooms," a "Music Practice Room," the "Approved Library," "Dormitory" facilities, a "Stage," and a "Teacher's Office;"

(xi) By failing to commence a duly noticed public hearing on Dragon Springs' Renewal Application and Redundant Site Plan Application within the applicable sixty-two day timeframe under New York State Law and the Town Zoning Law;

(xii) By delaying a duly noticed public hearing on Dragon Springs' Renewal Application and Redundant Site Plan Application by 211 days and 126 days respectively to May 8, 2013, and to the date hereof failing to issue decisions thereon, including after Dragon Springs' First Demand, Second Demand and Final Demand;

(xiii) By demanding that Dragon Springs pay $150,000 as a condition of approval of a land use permit and to conclude these absurd proceedings in lieu of real estate taxes from which Dragon Springs is lawfully exempt; and

(xiv) By continuing, to date, the processing and review of Dragon Springs' Renewal Application despite the fact that the renewal of Dragon Springs' Special Use Permit for a Place of Worship was rendered moot because the Town Board duly adopted the Zoning Amendment, making a Place of Worship like Dragon Springs, which includes religious educational uses, a principally permitted use as of right no longer subject to regulation by a Special Use Permit or renewal thereof despite the fact that Defendants' own counsel recognized the drastic change in Dragon Springs' status to a permanent principally permitted use and that Defendant Planning Board could then no longer pursue review of the Renewal Application.

325. Defendants manipulated the Town's Zoning Law and selectively and discriminatorily applied purported zoning regulations in a manner that was not neutral or traceable to municipal land planning goals.

C&F: 2202077.42

71

326.  Defendants' actions complained of herein impose a substantial burden on the religious exercise of Dragon Springs and its worshippers.

327.  Defendants' imposition of the aforementioned substantial burdens upon Dragon Springs was and is not in furtherance of any legitimate compelling governmental interest.

328.  Even if Defendants could demonstrate a legitimate compelling governmental interest, which they cannot, Defendants cannot show that the imposition of these substantial burdens were and are the least restrictive means of furthering the compelling governmental interest.

329.  Dragon Springs is, therefore, entitled to such relief as the Court deems to be appropriate under the circumstances, including but not limited to declaratory relief, injunctive relief, compensatory damages, and the costs and expenses of this action, including Dragon Springs' reasonable attorneys' fees under 42 U.S.C. § 1988(b).

## SECOND CLAIM FOR RELIEF

### For Violation Of RLUIPA
### By Virtue Of Unreasonable Restrictions
### Imposed By Defendants on Dragon Springs

330.  Dragon Springs respectfully repeats and realleges all prior allegations of the Complaint with the same full force and effect as if set forth at length and verbatim.

331.  Defendants, acting in their capacity as governmental entities and/or agents, selectively imposed restrictive land use "regulations" and conditions upon Dragon Springs.

332.  That these land use regulations imposed substantial burdens on Dragon Springs and its worshippers' religious exercise.

C&F: 2202077.42

333. Defendants imposed substantial burdens on Dragon Springs in the implementation of a land use regulation or system of land use regulations, under which Defendant governmental entities and agents make, or have in place formal and/or informal procedures and/or practices that permit Defendants to make individualized assessments of the proposed uses for the property involved.

334. Defendants imposed and/or implemented land use regulations in an effort to unreasonably, arbitrarily, and/or capriciously limit Dragon Springs' religious worship, institution, structures, and the internal operations of Dragon Springs' religious beliefs within the Town.

335. That religious education is an express component of a Place of Worship as defined under the Town Zoning Law.

336. That religious exercise is defined broadly under RLUIPA, and includes religious exercise and related activities.

337. That Dragon Springs' Temple at the Property exists as a center for religious practice, study, and as a sanctuary for those persecuted on the basis of their religious beliefs.

338. That religious education is central to Dragon Springs' worshippers' faith and the teaching and continuation of their faith and tradition.

339. Defendants arbitrarily, capriciously, and unlawfully imposed and implemented the Town Zoning Law to discriminate against Dragon Springs and its worshippers on the basis of their religion and religious denomination in contrast from what in Defendants' view are, *inter alia*, other mainstream religious institutions or local applicants, *inter alia*, as set forth in ¶ 324, *supra*.

C&F: 2202077.42

73

340. Defendants' improper restriction of Dragon Springs' religious education through the Special Use Permit process and Site Plan approval process is a violation of RLUIPA and constitutes a substantial burden restricting Dragon Springs' right to exercise religion freely.

341. Defendants' arbitrary, capricious, and unlawful imposition and implementation of the laws, including without limitation Defendants' imposition of the Population Limitation, the Child Residency Ban, and the Annual Renewal Condition, unreasonably limited and controlled the development of Dragon Springs' Temple, its worshippers' spiritual faith, the assembly of its worshippers, and the development of Dragon Springs within the Town.

342. The continuing actions taken by Defendants and the continuing existence of the Population Limitation, the Child Residency Ban, and the Annual Renewal Condition, imposed, and continue to impose, a substantial burden on the religious exercise of Dragon Springs and its worshippers.

343. Defendants' imposition upon Dragon Springs of the aforementioned substantial burdens is not in furtherance of any legitimate compelling governmental interest.

344. Even if Defendants could demonstrate a legitimate compelling governmental interest, which they cannot, Defendants cannot show that the imposition of these substantial burdens were and are the least restrictive means of furthering the compelling governmental interest.

345. Dragon Springs is, therefore, entitled to such relief as the Court deems to be appropriate under the circumstances, including but not limited to declaratory relief,

74

injunctive relief, compensatory damages, and the costs and expenses of this action, including Dragon Springs' reasonable attorneys' fees under 42 U.S.C. § 1988(b).

### THIRD CLAIM FOR RELIEF

#### For Violation of RLUIPA
#### By Virtue Of Defendants' Imposition Of Unequal Terms On Dragon Springs

346. Dragon Springs respectfully repeats and realleges all prior allegations of the Complaint with the same full force and effect as if set forth at length and verbatim.

347. Defendants, acting in their capacity as governmental entities and/or agents, imposed land use regulations upon Dragon Springs.

348. That these land use regulations imposed a substantial burden on Dragon Springs and its worshippers' religious exercise.

349. Defendants imposed substantial burdens on Dragon Springs in the implementation of a land use regulation or system of land use regulations, under which Defendant governmental entities and agents make, or have in place, formal and/or informal procedures and/or practices that permit Defendants to make individualized assessments of the proposed uses for the property involved.

350. Defendants imposed and/or implemented land use regulations in a manner that treats Dragon Springs as a religious assembly or institution on less than equal terms with other religious assemblies and/or institutions and nonreligious assemblies and/or institutions, including but not limited to other religious and nonreligious assemblies and/or institutions situated in the Town.

351. Defendants arbitrarily, capriciously, and unlawfully imposed and implemented the Town Zoning Law to treat Dragon Springs and its worshippers on less than equal terms than what Defendants perceived to be mainstream or local religious

75

C&F: 2202077.42

institutions, nonprofit, tax-exempt institutions, and/or other local landowners, *inter alia*, as set forth in ¶ 324, *supra*.

352. Defendants unlawfully abused and exceeded the authority conferred upon them by New York State Town Law to treat Dragon Springs and its worshippers on less than equal terms than what Defendants perceived to be mainstream or local religious institutions, nonprofit, tax-exempt institutions, and/or other local landowners, *inter alia*, as set forth in ¶ 324, *supra*.

353. Defendants, by continuously imposing, implementing, and manipulating land use regulations in the manner described herein, and by, *inter alia*, Defendants' actions and/or failures to act as set forth in ¶ 324, *supra*, imposed a substantial burden upon Dragon Springs' use of the Property and exercise of their religion.

354. Defendants' unequal treatment of Dragon Springs, as compared with other religious assemblies and/or institutions and nonreligious assemblies and/or institutions situated in the Town, in the imposition of Defendant Town's land use regulations was and is not in furtherance of a compelling governmental interest, nor is it the least restrictive means of furthering a compelling governmental interest.

355. Defendants have thereby violated Dragon Springs' constitutional rights under RLUIPA by the unequal treatment of Dragon Springs as a religious institution as compared with other religious and nonreligious institutions.

356. Without dedicated volunteers and financial resources to fight Defendants' illegal actions constantly, Defendants would long ago have succeeded in forcing Dragon Springs out of "their" town.

C&F: 2202077.42

76

357. Even if Defendants could demonstrate a legitimate compelling governmental interest to continue to impose a substantial burden on the free exercise of religious faith at Dragon Springs, which they cannot, Defendants cannot show that the imposition of these substantial burdens was and is the least restrictive means of furthering the compelling governmental interest.

358. Dragon Springs is, therefore, entitled to such relief as the Court deems to be appropriate under the circumstances, including but not limited to declaratory relief, injunctive relief, compensatory damages, and the costs and expenses of this action, including Dragon Springs' reasonable attorneys' fees under 42 U.S.C. § 1988(b).

## FOURTH CLAIM FOR RELIEF

### For Violation Of The Equal Protection Clause Of The Fourteenth Amendment To The United States Constitution On Account Of Race, Religion and National Origin

359. Dragon Springs respectfully repeats and realleges all prior allegations of the Complaint with the same full force and effect as if set forth at length and verbatim.

360. Defendants, acting through and in concert with each other, under color of law and in their respective official positions, and in furtherance of a custom or policy of the Town have deprived Dragon Springs and its worshippers of their constitutionally protected rights, in violation of their First and Fourteenth Amendment rights to free religious exercise, free assembly, and equal protection of the laws on account of their religion, race and national origin.

361. Defendants have selectively and disparately treated Dragon Springs and its worshippers, when compared with others similarly situated, including without limitation the YMCA, which is wholly consistent with Defendants' discriminatory and/or retaliatory bad faith intent.

C&F: 2202077.42

362. Defendants' selective treatment has been motivated by an intention to discriminate on the basis of Defendants' impermissible consideration of Dragon Springs' religion, the impermissible consideration of the tenets and internal operational details thereof, and the impermissible consideration of Dragon Springs' worshippers' race and national origin.

363. Dragon Springs and its followers are of a race, religion and national origin completely different from and not reflective generally of what Defendants view to be the mainstream racial and religious composition of the Town.

364. Over the past twelve years, Defendants have spewed and incited innumerable racially charged comments reflecting religious animus directed toward Dragon Springs, which venomous comments have been made at, *inter alia*, public hearings by Defendant Planning Board, thereby evidencing discriminatory animus and a continuing wrong on the part of such Defendants.

365. Defendants have selectively treated Dragon Springs differently from others similarly situated on a steady and recurrent basis from 2001 through the present, and there was and is no rational basis, let alone compelling basis, whatsoever for such treatment.

366. That such discriminatory animus over a twelve year span inflicts a continuing harm upon Dragon Springs, evidenced in part by Defendants' most recent attempts in 2012 and 2013 to prohibit religious educational activities at Dragon Springs.

367. The facts set forth herein and, *inter alia*, in ¶ 324, *supra*, demonstrate unmistakable evidence of malice, racial animus, a bad faith intent to injure, and differential treatment lacking any rational or legal basis.

C&F: 2202077.42

368. As alleged in detail herein, Defendants treated Dragon Springs and its followers differently from what Defendants viewed as predominant mainstream churches, organizations and other "local" owners of property seeking similar or comparable use of their property in the Town.

369. Defendants have additionally imposed and selectively enforced alleged governmental regulations and conditions upon Dragon Springs, including, *inter alia*, as set forth in paragraph ¶ 324, *supra*, which Defendants never imposed on what they view to be the Town's predominant mainstream churches, institutions or other "local" applicants.

370. The content of Dragon Springs' religious mission, faith, teachings, practices, and other religious activities, and the differences between same and what Defendants view to be the predominant mainstream churches and other institutions in the Town, were known to and impermissibly considered by Defendants in their actions and failures to act toward Dragon Springs.

371. That Defendants have authorized or acted over time to accommodate most, if not all, of what Defendants view to be predominant mainstream churches and religious uses of real property in the Town without ever imposing additional delays, costs, burdens, controls, denials, constraints and limitations of the type imposed upon Dragon Springs despite the existence of similar issues presented by "mainstream" applicants, including without limitation, conditional Special Use Permit approval subject to annual administrative review and renewal.

372. Although other Places of Worship, as defined under the Town Zoning Law, and other institutions in the Town have developed their property despite their tax-

C&F: 2202077.42

exempt status, without open-ended inquiry into and investigation of their tax-exempt status, Dragon Springs' same status as a nonprofit religious institution was constantly singled out as a reason to otherwise limit, control, "watch," "count," "monitor," burden, restrain, limit, regulate, restrict and deny Dragon Springs the same rights conferred upon what Defendants, in an unlawful exercise of authority, consider to be "proper" tax-exempt organizations.

373. The imposition of these improper and *ultra vires* controls, limits, restraints, "monitoring" and burdens by Defendants upon Dragon Springs imposed costs, diverted funds, and interfered with Dragon Springs' primary mission, and consequently abridged Dragon Springs' rights to:

(i)     Free exercise of religion and Dragon Springs' continuation of religious educational activities;

(ii)    Assembly by imposing, *inter alia*, the Population Limitation and Child Residency Ban; and

(iii)   Speech by prohibiting visitors and worshippers wishing to assemble, practice and to worship in accordance with Dragon Springs' religious beliefs.

374. Defendants' acts and omissions have also constrained and limited Dragon Springs' membership growth, to the injury of Dragon Springs and to the detriment of Dragon Springs' ability to raise revenue from its artificially and improperly limited membership, and correspondingly, to its ability to obtain the membership and financial resources, including investors, to advance Dragon Springs' religious mission, faith, teachings, and practices.

375. There existed at the time, and there continues to exist, no sufficient objective or rational basis for Defendants to require Dragon Springs to submit annual applications for renewed Special Use Permits.

C&F: 2202077.42

376.  Any purportedly objective rationales proffered by Defendants for their actions toward Dragon Springs, therefore, were and continue to remain little more than pretextual attempts to justify Defendants' impermissible discrimination against Dragon Springs.

377.  Despite failing in their efforts in 2004 to compel Dragon Springs to purchase a ladder fire truck as aforementioned, Defendants are now illegally seeking that Dragon Springs make a lump sum cash payment for new roads in the Town as a part of Defendants' Special Use Permit renewal process in whole or in part because Dragon Springs is a religious tax-exempt organization, which Defendants view as a "deep pocket."

378.  By conducting Dragon Springs' land use review process in a discriminatory, unauthorized and illegal manner by the conduct alleged herein, including without limitation Defendants' unlawful demands that Dragon Springs pay excessive monetary exactions to the Town for municipal improvements bearing no nexus to the Renewal Application, the illegal conditions and restrictions imposed by Defendants, and the burden placed by Defendants on Dragon Springs over a twelve year period either constantly to commence litigation to challenge and overturn each and every illegal action and condition, or, at tremendous cost and delay, comply with the Town's administrative process to develop and maintain its use of the Property as best as it could, always hoping that the most recent illegal act would be the last, Defendants denied to Dragon Springs equal protection of the laws.

379.  As detailed throughout this Complaint, Defendants have engaged in continuing conduct that is so outrageously discriminatory, capricious and irrational as to

81

constitute a gross abuse of governmental authority and violation of Dragon Springs' constitutional rights.

380. That Defendants have deprived and will continue to deprive Dragon Springs of its constitutionally protected right to equal protection of the laws on account of its members' religion, race and national origin.

381. That Defendants have caused and will continue to directly and proximately cause Dragon Springs to suffer compensatory damages in a substantial sum, the precise amount to be determined during discovery and upon trial, and such other, further and different relief as the Court may deem just and proper, including attorneys' fees, costs and disbursements.

## FIFTH CLAIM FOR RELIEF

### For Violation Of The Equal Protection Clause Of The Fourteenth Amendment To The United States Constitution On Account Of Arbitrary And Selective Enforcement

382. Dragon Springs respectfully repeats and realleges all prior allegations of the Complaint with the same full force and effect as if set forth at length and verbatim.

383. Defendants, acting through and in concert with each other, under color of law and in their respective official positions, and in furtherance of a custom or policy of Defendant Town, have deprived Dragon Springs and its worshippers of their constitutionally protected rights, in violation of their First and Fourteenth Amendment rights to free religious exercise, free assembly, and equal protection of the laws on account of their religion, race and national origin.

384. Defendants have selectively and arbitrarily mistreated Dragon Springs as compared with others similarly situated, including, *inter alia*, as set forth in ¶ 324, *supra*.

C&F: 2202077.42

82

385. Defendants' arbitrary and selective treatment of Dragon Springs was motivated by a malicious and bad faith intention to discriminate against, punish, injure and inhibit the exercise of constitutional rights by Dragon Springs and its worshippers on the basis of impermissible considerations, including Dragon Springs' worshippers' race, religion and nationality.

386. Defendants' disparate treatment of Dragon Springs was discriminatory in that Defendants arbitrarily and selectively interpreted and enforced the Town Zoning Law in a manner different from all past construction for what Defendants perceive as mainstream religious and/or comparable land use projects in the Town.

387. Over a twelve year span up to and including Dragon Springs' Renewal Application, there existed and there continues to exist a relentless, persistent and ongoing pattern of delay and discrimination against Dragon Springs' municipal permit applications in Defendant Town, for which there is no sufficient objective or rational basis.

388. Defendants imposed subjective, arbitrary, and unreasonable conditions and requirements upon Dragon Springs, which they never imposed upon any other Place of Worship, including without limitation, the Population Limitation, Child Residency Ban and Annual Renewal Condition – while simultaneously attempting to prohibit religious educational activities at Dragon Springs.

389. Defendants have selectively, capriciously and unlawfully required Dragon Springs to continue to pursue Defendants' approval of Dragon Springs' Renewal Application despite the intervening Zoning Amendment, which by operation of law made

83

such a Special Use Permit renewal unnecessary and rendered Defendants' permitting process a nullity and *ultra vires*.

390. Defendants' selective treatment of Dragon Springs was motivated, *inter alia*, by an intention to exact from Dragon Springs certain financial concessions as reparations for Dragon Springs' lawful tax-exempt status and exemption from local property taxes.

391. There was no rational basis, let alone compelling basis, for Defendants' treatment of Dragon Springs as opposed to others who were similarly situated.

392. Defendants' selective and discriminatory treatment of Dragon Springs was intentional, malicious and done in bad faith because, *inter alia*, Dragon Springs did not hold or practice what Defendants perceive as a mainstream or true religious faith and because Dragon Springs, in purchasing the Property in the year 2000, "took" the Property "off" Defendant Town's tax rolls.

393. Defendants have acted over time to accommodate most, if not all, of what they view to be predominant mainstream churches, temples and other nonprofit organizations in the Town without ever imposing additional delays, costs, burdens, controls, denials, constraints and limitations of the type imposed upon Dragon Springs, despite the existence of similar issues presented by other applicants.

394. Any purportedly objective rationales proffered by Defendants for their actions toward Dragon Springs were and remain pretextual attempts to justify Defendants' impermissible discrimination against Dragon Springs.

C&F: 2202077.42

395. Defendants' acts and omissions as set forth herein deprived and will continue to deprive Dragon Springs of its constitutionally protected rights to equal protection of the laws on account of its members religion, race and national origin.

396. Defendants have caused and will continue to directly and proximately cause Dragon Springs to suffer damages in a substantial sum, the precise amount to be determined during discovery and upon trial, together with such other, further and different relief as the Court may deem just and proper, including attorneys' fees, costs and disbursements.

## SIXTH CLAIM FOR RELIEF

### For Violation of Dragon Springs' Substantive Due Process Rights
### By Virtue Of Defendants' Arbitrary Application of Zoning Laws

397. Dragon Springs respectfully repeats and realleges all prior allegations of the Complaint with the same full force and effect as if set forth at length and verbatim.

398. Defendants, acting through and in concert with each other, under color of law and in their respective official positions, and in furtherance of a custom or policy of Defendant Town, have deprived Dragon Springs of its constitutionally protected property rights, in violation of Dragon Springs' Fifth Amendment and Fourteenth Amendment rights to due process of the law.

399. Under New York State law, Dragon Springs had a property right in its religious use of its 427± acre site as a fee owner beginning in or about 2001.

400. Dragon Springs had a property right under the Town Zoning Law and New York State Law (and federal law, including RLUIPA) to use its property free from restrictive discriminatory land use regulations and with minimal governmental

85

C&F: 2202077.42

interference, including for the operation of a religious school, except in the case where such use was a threat to the health and safety of the community.

401. Dragon Springs had a valid property interest in the lawful review of its Renewal Application by Defendant Planning Board and its members.

402. Dragon Springs had a legitimate claim of entitlement to automatic approval of its Renewal Application and in the expeditious issuance of a renewed Special Use Permit without the delay, excessive costs, and improper procedural obstacles and conditions imposed by Defendants, which were motivated by Defendants' malevolent religious and/or racial animus, absent which, Dragon Springs was entitled to receive a renewed Special Use Permit automatically under the terms of the Annual Renewal Condition, as it had for the preceding five years prior to the Renewal Application.

403. In violation of Dragon Springs' substantive due process rights, Defendants infringed upon Dragon Springs' property interests in an arbitrary, abusive, shocking and irrational manner.

404. Defendant Planning Board does not have "discretion" under New York law to deny a Special Use Permit renewal by intentional delay involving actions patently beyond their statutory authority and the bounds of the law, including the imposition of illegal conditions of approval (e.g., the Population Limitation, Child Residency Ban and Annual Renewal Condition) and the attempted exaction of financial ("community") benefits in lieu of taxes during the land use permitting process.

405. Defendant Planning Board cannot condition, delay review of, or deny Dragon Springs' Renewal Application because Dragon Springs refuses to pay substantial fines or "taxes" as a "quid pro quo" for continuation of its nondiscretionary use under New

C&F: 2202077.42

York Town Law in accordance with the statutorily limited delegated powers of Defendant Planning Board.

406. At all relevant times, Defendants knew that both New York State and federal law mandate municipalities to accommodate religious uses in residential zones and that they must uphold a religious institution's right to use its property for any purpose that advances its religious use, including religious education, except in the narrow case where there exists a clear and direct threat to the health and safety of the community.

407. Dragon Springs has a right to use its Property subject only to the limitations of facially neutral and neutrally applied and enforced land use regulations legally enacted and legally applied by the Town and its elected and appointed officials in like manner to all applicants.

408. Defendants were all on actual notice of this and had actual knowledge by virtue of the ZBA Decision, which dispostively determined that Dragon Springs is a Place of Worship and recognized Dragon Springs' rights under RLUIPA.

409. Defendants never identified any true threat to the health and safety of the community with respect to any aspect of Dragon Springs' proposals, as confirmed by the Town Engineer's Certification that:

> [A]ll work in progress was within the Planning Board and Building Department parameters.

410. There continues to exist no legitimate or sufficient objective or rational basis for Defendants' acts or failures to act with respect to Dragon Springs' Renewal Application and/or Redundant Site Plan Application.

411. Under New York law, the Town Zoning Law, and by operation of the Zoning Amendment, Defendants cannot condition Dragon Springs' principally permitted use to

C&F: 2202077.42

which it is entitled as of right to a Special Use Permit, annual renewal thereof, or any condition contained therein.

412. The foregoing continuing wrongs of Defendants have deprived and will continue to deprive Dragon Springs and its worshippers of their constitutionally protected rights herein.

413. Defendants' treatment of Dragon Springs was unconstitutional in that Defendants arbitrarily and selectively interpreted and enforced the Town Zoning Law in an irrational and illegal manner against Dragon Springs in a way that differs substantially from what Defendants viewed as mainstream applicants and landowners in the Town.

414. Defendants and their agents publicly mocked, belittled and continuously questioned Dragon Springs' status as a Place Of Worship and its religious use of the Property, *inter alia*, as set forth *supra* herein. *See also* Exhibit B.

415. Defendants' continued discrimination against Dragons Springs illustrates a deprivation of Dragon Springs' property interest in an arbitrary, abusive, shocking and irrational manner as to violate their substantive due process rights guaranteed by the United States Constitution.

416. Defendants had no basis in law and acted *ultra vires* by requiring Dragon Springs to continue to pursue approval of its Renewal Application after the Zoning Amendment.

417. Defendants imposed subjective, arbitrary, irrational, and unreasonable conditions and requirements upon Dragon Springs.

C&F: 2202077.42

418. Any purportedly objective rationale proffered by Defendants for their actions toward Dragon Springs is a pretextual attempt to justify Defendants' impermissible and continuing discrimination against Dragon Springs.

419. The foregoing acts of Defendants have deprived and, unless enjoined, will continue to deprive Dragon Springs of its constitutionally protected property rights to due process of law.

420. Defendants have caused and, unless enjoined, will continue to cause Dragon Springs to suffer damages in a substantial sum, the precise amount to be determined during discovery and upon trial, together with such other, further and different relief as to the Court may seem just and proper in the premises including attorneys' fees, costs and disbursements.

## SEVENTH CLAIM FOR RELIEF

### For Violation Of The Takings Clause By The Imposition
### Of Unconstitutional Conditions In Connection With A Land Use Permit

421. Dragon Springs respectfully repeats and realleges all prior allegations of the Complaint with the same full force and effect as if set forth at length and verbatim.

422. Under New York State law, Dragon Springs had a property right in its 427 ± acre site as an owner in fee simple beginning in or about 2001.

423. Defendants, acting in their capacity as governmental entities and/or agents, are authorized by New York State law to impose a system of land use regulation on real property owners within in the Town.

424. Defendants imposed such a system of land use regulation on Dragon Springs and the Property pursuant to a Town Zoning Law adopted under New York State law.

C&F: 2202077.42

425. Defendants selectively imposed the Town Zoning Law on Dragon Springs, including, *inter alia*, restrictive land use regulations and conditions, and as set forth in ¶ 324, *supra*, which affected Dragon Springs' property interest.

426. Dragon Springs submitted its Renewal Application on October 9, 2012.

427. The Town Engineer's Certification dated January 3, 2013 confirmed that Dragon Springs was in compliance with all of Defendant Planning Board's and the Town Building Department's parameters, which entitled Dragon Springs to automatic renewal of its Special Use Permit without further review, delay, or appearance before Defendant Planning Board per the terms of the Annual Renewal Condition.

428. The Town Engineer's Certification nevertheless unlawfully determined that Dragon Springs should undergo "Site Plan modification" and "Special Use Permit modification and time period."

429. Defendant Planning Board adopted the illegal determinations contained in the Town Engineer's Certification and compelled Dragon Springs to participate in municipal review of its use of the Property, which at all relevant times was a Place of Worship pursuant to the Town Zoning Law and consistent with Defendant Town's binding determination of such status in the ZBA Resolution.

430. Dragon Springs complied with Defendant Town's egregious, coercive demand, notwithstanding the fact that Dragon Springs' use of the Property was no longer subject to a Special Use Permit by operation of the Zoning Amendment, as discussed *supra*, and Dragon Springs' First Demand, Second Demand and Final Demand.

C&F: 2202077.42

431. That Defendants have long viewed Dragon Springs as a "deep pocket" and source of financial gain for the benefit of the entire Town, notwithstanding that Dragon Springs is a tax-exempt, nonprofit, insular, self-sufficient Place of Worship for its worshippers.

432. On July 9, 2013, nine months after Dragon Springs filed its Renewal Application, Defendants attempted to exact a cash payment from Dragon Springs to pay for "new roads" in the Town, which are not on and bear no reasonable nexus to the Property, and which demand Defendants coercively imposed as a condition precedent to the mere renewal of a superfluous and unnecessary Special Use Permit and Site Plan approval.

433. On July 9, 2013, The Town Engineer sent a letter to Defendant Planning Board Chairman stating:

> We believe that any agreement for road repair should be worked out with the applicants as part of the special use permit process.

434. That on a personal visit to Dragon Springs' property, the Town Engineer outrageously informed Dragon Springs' President that all of Dragon Springs' "problems" with the Town could be settled by a $150,000 lump sum cash deposit into a Town bank account at a specific banking institution.

435. That Defendants' recent demands are consistent with a pattern of unlawful conditions, including one in which Defendants, pursuant to a discriminatory, accepted Town policy, attempted to coerce Dragon Springs into purchasing for the Town expensive fire equipment and the construction of a building to house same (at a cost that would have likely exceeded $1,000,000, despite the complete absence of a

C&F: 2202077.42

sufficient nexus between Dragon Springs' project and this equipment generally desired by the Town, for which Defendant Planning Board and certain members thereof aggressively attempted to force Dragon Springs to pay.

436. That Dragon Springs, in a gesture of good faith and out of a desire to resolve differences with Defendants, even considered paying for the reasonable cost of road repair so the parties could move forward together in a collaborative and amicable fashion.

437. That even the foregoing was not sufficient for Defendants, who adamantly insisted that Dragon Springs pay for "new roads" as the "price" for their approval of the Renewal Application and Site Plan application.

438. That Defendants' coercive, manifest demand that Dragon Springs pay for "new roads" was made as a part of Defendants' land use permitting process.

439. That Defendants' demand that Dragon Springs pay for "new roads" as a condition precedent to Defendants' granting of Dragon Springs' routine Renewal Application violates Dragon Springs' rights under the Fifth Amendment to the United States Constitution insofar as it constitutes an unconstitutional condition imposed in the land use permitting process and a taking of Dragon Springs' property in violation of its rights.

440. Dragon Springs is, therefore, entitled to such relief as the Court deems to be appropriate under the circumstances, including but not limited to declaratory relief, injunctive relief, compensatory damages, and the costs and expenses of this action, including but not limited to Dragon Springs' reasonable attorneys' fees.

C&F: 2202077.42

### EIGHTH CLAIM FOR RELIEF

### For Violation Of Procedural Due Process

441. Dragon Springs respectfully repeats and realleges all prior allegations of the Complaint with the same full force and effect as if set forth at length and verbatim.

442. Defendants have violated Dragon Springs' right to due process under the Fifth Amendment to the United States Constitution as made applicable to Defendants by the Fourteenth Amendment to the United States Constitution.

443. Under New York State law and pursuant to the 2001 ZBA Resolution, Dragon Springs had a right in the Property, beginning as a fee owner in or about 2001.

444. Dragon Springs had a right to develop its Property subject only to the limitations of facially neutral and neutrally enforced land use regulations legally enacted and applied by Defendant Town.

445. Dragon Springs had a property right under New York State law to use the Property free from restrictive land use regulations, exactions in lieu of taxes, and with minimal governmental interference, except in the case where there was a threat to the health and safety of the community.

446. Dragon Springs has liberty and/or property interests under the Constitution, which Defendants interfered with by employing constitutionally insufficient procedures against Dragon Springs that were attendant upon Defendants' deprivation of Dragon Springs' rights.

447. That at the time of Dragon Springs' Renewal Application, Defendant Town's Zoning Law required Dragon Springs to obtain a Special Use Permit for its religious use as a Place of Worship.

C&F: 2202077.42

93

448. That during the pendency of Dragon Springs' Renewal Application, Defendants adopted the Zoning Amendment, which principally permits Places of Worship in the RR Zoning District as of right.

449. That the intervening Zoning Amendment operated to make Defendants' continued proceedings on Dragon Springs' Renewal Application illegal, null, and void.

450. That nevertheless, Defendants compelled Dragon Springs to continue with the municipal permitting process under color of law.

451. That during Defendants' prolonged and *ultra vires* review of Dragon Springs' Renewal Application, Defendants imposed exactions on Dragon Springs, without due process, as a condition of approval of Dragon Springs' continued, unchanged use of the Property pursuant to its Renewal Application.

452. That all of the foregoing acts and omissions by Defendants were part and parcel of a civil rights conspiracy that deprived Dragon Springs of any meaningful due process, intentionally, to thwart, restrain, burden, control, limit and illegally discriminate against Dragon Springs and its followers.

453. That there is no legitimate objective or rational basis for Defendants' acts or failures to act with respect to Dragon Springs' Renewal Application.

454. That Defendants' continuing acts have deprived and will continue to deprive Dragon Springs of their Fifth Amendment right to be free from unconstitutional conditions and have deprived Dragon Springs of equal protection of the laws in violation of the Fourteenth Amendment to the Constitution.

C&F: 2202077.42

455. That Dragon Springs and its representatives repeatedly were denied their right to full, fair, and impartial hearings before Defendants through a continuous civil rights conspiracy that forms the subject of this action.

456. Defendants, acting through and in concert with each other, under color of law and in their respective official positions, and in furtherance of a custom or policy of the Town have deprived and will continue to deprive Dragon Springs of its constitutionally protected property rights, in violation of Dragon Springs' Fifth and Fourteenth Amendment rights to due process of the law.

457. Dragon Springs is, therefore, entitled to such relief as the Court deems to be appropriate under the circumstances, including but not limited to declaratory relief, injunctive relief, compensatory damages, and the costs and expenses of this action, including Dragon Springs' reasonable attorneys' fees.

## NINTH CLAIM FOR RELIEF

### For Declaratory Judgment Under 28 U.S.C. § 2201
### That Dragon Springs' Place of Worship Is Now A Principally Permitted Use, Not Subject To Special Use Permit Renewal By Operation Of Law

458. Dragon Springs respectfully repeats and realleges all prior allegations of the Complaint with the same full force and effect as if set forth at length and verbatim.

459. An actual and justiciable controversy within this Court's jurisdiction exists herein between Dragon Springs and Defendants.

460. Beginning with the 2001 ZBA Decision and continuing to date, under the United States Constitution, federal law, and New York law, Dragon Springs had a protected interest in the use of the Property for religious purposes and as a Place of Worship as defined in the Town Zoning Law.

C&F: 2202077.42

461. Under New York law, Dragon Springs acquired a property interest in the religious use of the Property pursuant to the ZBA Decision.

462. Defendant Town and Defendant Planning Board only possess limited authority as expressly conferred by the New York State Legislature and enabled by New York State Town Law.

463. At the time that Dragon Springs filed its Renewal Application, the Town Zoning Law classified a "Place of Worship," as defined *supra*, as a specially permitted use in the RR Zoning District.

464. On March 25, 2013, five months into Defendants' review of the Renewal Application, Defendants, acting pursuant to their authority under New York State Town Law and the Town Zoning Law, duly adopted the Zoning Amendment, which provides that a "Place of Worship," as defined therein, is a principally permitted use as of right in the RR Zoning District.

465. Despite the Zoning Amendment, Defendants have persisted in requiring Dragon Springs to seek their approval of the Renewal Application, even though at that time Dragon Springs' right to use the Property as its Place of Worship had become a principally permitted use.

466. After the Zoning Amendment, Defendants were required to recognize Dragon Springs' Place of Worship as a Principally Permitted Use no longer subject to Special Use Permit regulation.

467. Under New York State Law, after the Zoning Amendment, Defendants could not legally compel Dragon Springs to continue to pursue approval of the Renewal Application.

C&F: 2202077.42

468.  Defendants have, therefore, exceeded their authority as conferred by the New York State Legislature and acted in an *ultra vires* capacity to impose an illegal municipal permitting process on Dragon Springs.

469.  Dragon Springs accordingly asks that the Court issue a declaration ordering, adjudging, and decreeing that:

(i)    Pursuant to the Zoning Amendment, Dragon Springs' Place of Worship including religious educational uses and all customary, appurtenant uses, are now principally permitted uses in the RR Zoning District;

(ii)   Pursuant to the Zoning Amendment, Dragon Springs has the permanent right to use the Property as a Place of Worship in furtherance of its constitutional rights to free exercise of religion, assembly, and speech without being subject to Special Use Permit renewal;

(iii)  Defendants have acted *ultra vires* by their continuation of Special Use Permit regulation of Dragon Springs after the Zoning Amendment;

(iv)   Defendants are enjoined from continuing such municipal process; and

(v)    Defendants are permanently enjoined from conditioning Dragon Springs' use of the Property as a Place of Worship upon new roads paid for by Dragon Springs or any similar monetary exactions.

470.  As a result of the foregoing declaration, Dragon Springs respectfully requests that the Court:  (i) enjoin Defendants from continuing a Special Use Permit process and regulation of Dragon Springs; and (ii) award to Dragon Springs damages, attorneys fees and such other relief as the Court deems just and proper.

## TENTH CLAIM FOR RELIEF

### For Declaratory Judgment Under 28 U.S.C. § 2201
### That Dragon Springs Is Entitled To A Renewed Special Use Permit

471.  Dragon Springs repeats and realleges all prior allegations of the Complaint.

472.  An actual and justiciable controversy within this Court's jurisdiction exists herein between the parties.

C&F: 2202077.42

473.  Defendant Town and Defendant Planning Board possess only the limited authority expressly conferred by the New York State Legislature and enabled by New York Town Law.

474.  Defendants were required under the terms of the Annual Renewal Condition to review and approve Dragon Springs' Renewal Application administratively and automatically, and, to the extent that any public hearing was necessary, Defendants were required by statute to review and approve the Renewal Application within sixty-two days after the close of the May 8, 2013 public hearing.

475.  Dragon Springs filed the Renewal Application on October 9, 2012.

476.  Far more than sixty-two days have elapsed from the close of the May 8, 2013 public hearing and Defendants have not yet rendered a decision as required by Town Law § 274-b.

477.  Under New York Law, Defendant Planning Board has no discretion to deny a Special Use Permit renewal to Dragon Springs because all conditions of the Zoning Law were met.

478.  Defendants conducted an inspection of the Property and found in the Town Engineer's Certification that "all work in progress was within the Planning Board and Building Department parameters."

479.  That at all relevant times, Dragon Springs was entitled, pursuant to its rights under the United States Constitution, federal law, New York State law, the ZBA Decision, the 2006 Resolution, 2011 Site Plan Approval, and the Town Zoning Law to conduct religious education activities on the Property.

C&F: 2202077.42

480. That Defendants have unreasonably delayed in issuing Dragon Springs a renewed Special Use Permit in order to exact from Dragon Springs a cash payment for "new roads" as part of the Special Use Permit process in lieu of property taxes, which "new roads" have no essential nexus or rough proportionality to the Renewal Application, as a result of which the condition is unconstitutional and illegal.

481. That Defendants have discriminated against Dragon Springs as contrasted from what Defendants view as other mainstream religious organizations and/or institutions in violation of Dragon Springs' right to equal protection of the laws as guaranteed by the Fourteenth Amendment to the United States Constitution.

482. Defendants have exceeded their authority as conferred by the New York State Legislature and acted in an *ultra vires*, unreasonable, and discriminatory capacity to delay municipal review of Dragon Springs' Renewal Application.

483. Defendants have violated the Fifth Amendment to the United States Constitution by imposing an unconstitutional condition on Dragon Springs in connection with Defendant Town's land use permitting process.

484. Based upon the foregoing, Dragon Springs respectfully requests that the Court issue a declaration ordering, adjudging, and decreeing that:

(i)     Dragon Springs is permanently entitled to use the Property for religious education purposes in furtherance of its constitutional rights to free exercise of religion, assembly, and speech as of right;

(ii)    Defendants have discriminatorily and unreasonably delayed the issuance of a renewed Special Use Permit to Dragon Springs per its Renewal Application in violation of Dragon Springs' right to equal protection of the laws;

(iii)   Defendants have discriminatorily and unreasonably delayed the issuance of a renewed Special Use Permit to Dragon Springs in violation of state law;

C&F: 2202077.42

99

(iv)    That Defendants have acted *ultra vires* by imposing an unconstitutional condition of approval in connection with Defendant Town's land use permitting process; and

(v)     By way of a mandatory permanent injunction, Defendants are required to grant Dragon Springs' Renewal Application unconditionally without further delay.

485.   As a result of the foregoing declaration, Dragon Springs respectfully requests that the Court issue a mandatory permanent injunction requiring Defendants to grant Dragon Springs' Renewal Application unconditionally without further delay.

### ELEVENTH CLAIM FOR RELIEF

**For Declaratory Judgment Under 28 U.S.C. § 2201
Striking The Unlawful Conditions Imposed
By Defendants In Dragon Springs' Special Use Permit**

486.   Dragon Springs respectfully repeats and realleges all prior allegations of the Complaint with the same full force and effect as if set forth at length and verbatim.

487.   An actual and justiciable controversy within this Court's jurisdiction exists herein between the parties.

488.   That at all relevant times, Dragon Springs was entitled pursuant to its rights under the United States Constitution, federal law, New York State law and the Town Zoning Law to conduct religious activities and religious education activities to all of its worshippers regardless of their age on the Property.

489.   Defendant Town and Defendant Planning Board possess certain limited authority as conferred by the New York State Legislature and enabled by New York State Town Law, including the limited authority to review and approve Special Use Permits for:

> [A]uthorization of a particular land use which is permitted in a zoning ordinance or local law, subject to requirements imposed by such zoning ordinance or local law to assure

C&F: 2202077.42

that the proposed use is in harmony with such zoning ordinance or local law and will not adversely affect the neighborhood if such requirements are met.

490. Defendants have limited authority "to impose such reasonable conditions and restrictions as are directly related to and incidental to the proposed special use permit."

491. Under New York State Law, Defendant Planning Board lacks discretion to impose unreasonable conditions in connection with a Special Use Permit.

492. Defendants, acting in their capacity as governmental entities and/or agents, selectively imposed restrictive and illegal conditions upon Dragon Springs in the 2006 Resolution, and in every subsequently renewed Special Use Permit thereafter issued by Defendants, including the unreasonable and unlawful Population Limitation, Child Residency Ban, and Annual Renewal Condition.

493. That the conditions substantially burden Dragon Springs and its worshippers' free exercise of their faith.

494. That Defendants imposed and/or implemented these unreasonable conditions wrongfully in an effort to limit Dragon Springs' religious assembly, institution, structures, and the internal operations of Dragon Springs' religious beliefs within the Town.

495. That Defendants continue to impose these restrictive and illegal conditions against Dragon Springs, which continue to substantially burden the religious exercise of Dragon Springs and its worshippers.

C&F: 2202077.42

496. Defendants' imposition of a substantial burden has neither been in furtherance of any legitimate compelling governmental interest nor incidental to Dragon Springs' use of the Property as a Place of Worship.

497. Dragon Springs is, therefore, entitled to such relief as the Court deems to be appropriate under the circumstances, including without limitation, declaratory relief and injunctive relief.

498. Based upon the foregoing, Dragon Springs respectfully requests that the Court issue a declaration ordering, adjudging, and decreeing that:

(i)     Dragon Springs is permanently entitled to use the Property for religious purposes in furtherance of its constitutional rights to free exercise of religion, assembly, and speech as of right;

(ii)    Defendants have discriminatorily and unreasonably limited the age and number of permanent residents and visitors that may be on the Property in violation of Dragon Springs' right to equal protection of the laws;

(iii)   Defendants have discriminatorily and unreasonably limited the number of permanent residents and visitors that may be on the Property in violation of state law;

(iv)    Defendants have discriminatorily and unreasonably imposed the Annual Renewal Condition for Dragon Springs' use of the Property as a Place of Worship; and

(v)     By way of a mandatory permanent injunction, Defendants are required to grant Dragon Springs' Renewal Application unconditionally without further delay.

499. As a result of the foregoing declaration, Dragon Springs respectfully requests that the Court issue a mandatory permanent injunction requiring Defendants to grant Dragon Springs' Renewal Application unconditionally and without further delay.

C&F: 2202077.42

## TWELFTH CLAIM FOR RELIEF

### For Declaratory Judgment Under 28 U.S.C. § 2201
### That Defendants Lack Authority To Determine Whether Dragon Springs
### Requires Any Review Or Approval For A Religious School At The Property

500. Dragon Springs respectfully repeats and realleges all prior allegations of the Complaint with the same full force and effect as if set forth at length and verbatim.

501. An actual and justiciable controversy within this Court's jurisdiction exists herein between the parties.

502. That Defendant Planning Board possesses limited authority as conferred by the New York State Legislature and enabled by New York State Town Law and the Town Zoning Law.

503. That the authority of Defendant Planning Board does not include issuing interpretations of, determining compliance with, and/or enforcing the Town Zoning Law.

504. That under New York State Town Law and the Town Zoning Law, the aforementioned powers are legally vested in the Town Building Inspector, with appellate review by the Town Zoning Board of Appeals.

505. That Defendant Planning Board unlawfully engaged in analysis and interpretation of Dragon Springs' use of the Property (as per the Town Engineer's equally *ultra vires* interpretation) concluding that Dragon Springs' use of the Property for religious education as a component of a Place of Worship required either: (i) renewal of Dragon Springs' Special Use Permit; (ii) a "new" Special Use Permit; and/or (iii) a "new" Site Plan approval.

506. That despite Dragon Springs' numerous representations to Defendants that there was and is no proposal for new construction at the Property, and the Town

C&F: 2202077.42

103

Engineer's own conclusion that Dragon Springs was and is in compliance with all of Defendants' approvals, Defendant Planning Board member Derek Wilson openly declared that the Planning Board was considering whether "a school can or can't be built up there," a determination that completely dehors the legal authority of a planning board.

507. That Defendant Planning Board does not have the authority to make the determination being "considered," as referenced by Defendant Derek Wilson hereinabove.

508. That, accordingly, Defendant Planning Board has acted completely outside the scope of its legal authority in considering Dragon Springs' Renewal Application herein.

509. Based upon the foregoing, Dragon Springs respectfully requests that the Court issue a declaration ordering, adjudging, and decreeing:

(i)    That Dragon Springs is permanently entitled to use the Property for religious purposes in furtherance of its constitutional rights to free exercise of religion, assembly, and speech as of right;

(ii)    That Defendant Planning Board has acted completely outside the scope of its authority in reviewing, determining and/or interpreting Dragon Springs' compliance with the Town Zoning Law; and

(iii)    That upon the effective date of the Zoning Amendment, Dragon Springs was vested with the permanent right to the use of its Place of Worship, including religious education, as a principally permitted use no longer subject to a Special Use Permit; and

(iv)    By way of a mandatory permanent injunction, Defendants are required to grant Dragon Springs' Renewal Application unconditionally without further delay.

C&F: 2202077.42

## THIRTEENTH CLAIM FOR RELIEF

### For Redress Under 42 U.S.C. § 1983
### For The Aforesaid Constitutional Violations

510. Dragon Springs respectfully repeats and realleges all prior allegations of the Complaint with the same full force and effect as if set forth at length and verbatim.

511. Dragon Springs' conduct in pursuing its property rights and its rights to the free exercise of religion, assembly and speech free from discrimination by virtue of its members' minority religious status and nationality is conduct that is protected by the First Amendment, the Due Process clauses of the Fifth and Fourteenth Amendments, and the equal protection clause of the Fourteenth Amendment to the United States Constitution.

512. Dragon Springs' actions in furtherance of its constitutionally protected rights prompted and/or substantially caused Defendants' actions in, *inter alia*, unlawfully discriminating and retaliating against Dragon Springs and denying Dragon Springs its due process rights.

513. Defendants' actions effectively chilled the exercise of Dragon Springs' and its worshippers' constitutional rights as set forth herein.

514. Dragon Springs is, therefore, entitled to such relief as the Court deems to be appropriate under the circumstances, including but not limited to declaratory relief, injunctive relief, compensatory damages, and the costs and expenses of this action, including Dragon Springs' reasonable attorneys' fees.

C&F: 2202077.42

## FOURTEENTH CLAIM FOR RELIEF

### For Relief Under The All Writs Act 28 U.S.C. § 1651

515. Dragon Springs respectfully repeats and realleges all prior allegations of the Complaint with the same full force and effect as if set forth at length and verbatim.

516. Pursuant to the All Writs Act, 28 U.S.C. § 1651(a), this Court has the authority to issue all writs necessary or appropriate in aid of its jurisdiction and agreeable to the usages and principles of law.

517. Dragon Springs is entitled under the All Writs Act to a judgment designed to achieve the ends of justice entrusted to this Court in a just and equitable manner as fashioned by the Court herein.

## FIFTEENTH CLAIM FOR RELIEF

### For Redress Under The New York State Constitution

518. Dragon Springs respectfully repeats and realleges all prior allegations of the Complaint with the same full force and effect as if set forth at length and verbatim.

519. Pursuant to Article I § 3 of the New York State Constitution, Dragon Springs is "forever" entitled to the free exercise and enjoyment of its religious profession and worship, without discrimination or preference.

520. In accordance with Article I § 3 of the New York State Constitution a municipality must apply zoning ordinances in a flexible manner.

521. Dragon Springs has been subjected to a unique and discriminatory land use process manipulated by Defendants to exact financial gains from Dragon Springs through a Special Use Permit process, which is null and void by operation of law.

C&F: 2202077.42

522. That the Town is subjecting Dragon Springs to a tailored land use process including illegal Special Use Permit renewal requirements and improper exactions, as compared to other secular and nonsecular institutions.

523. Pursuant to Article I § 8 of the New York State Constitution, Dragon Springs and its members have the right to speak free from governmental restraints on that freedom.

524. Pursuant to Article I § 11 of the New York State Constitution, Dragon Springs is entitled to equal protection of the laws of New York State or any subdivision thereof and Defendants are prohibited from discriminating against Dragon Springs and its members and/or denying the civil rights of Dragon Springs and its members on the basis of Dragon Springs' members' race, color, creed and/or religion.

525. Dragon Springs is therefore entitled to such relief as the Court deems to be appropriate under the circumstances, including but not limited to declaratory relief, injunctive relief, compensatory damages, and the costs and expenses of this action, including Dragon Springs' reasonable attorneys' fees.

## SIXTEENTH CLAIM FOR RELIEF

### For Redress Under Article 78 Of The New York Civil Practice Law And Rules

526. Dragon Springs respectfully repeats and realleges all prior allegations of the Complaint with the same full force and effect as if set forth at length and verbatim.

527. Under New York State law, Dragon Springs had a property right in its 427 ± acre Property as a fee owner beginning in or about 2001 and pursuant to the ZBA Decision.

C&F: 2202077.42

528. Defendants, acting in their capacity as governmental entities and/or agents, are authorized by New York State law to impose a system of land use regulation on real property owners within in the Town.

529. Defendants imposed such a system of land use regulation pursuant to an adopted Town Zoning Law.

530. Defendants selectively imposed restrictive land use regulations and conditions upon Dragon Springs, which imposed a substantial burden on Dragon Springs' and its worshippers' free exercise of their faith.

531. Defendant Planning Board does not have discretion under New York State law to deny Special Use Permit renewal by intentional delay involving actions patently beyond their statutory authority and the bounds of the law, including the imposition of illegal conditions of approval (*e.g.*, the Population Limitation, Child Residency Ban, and Annual Renewal Condition) and the attempted exaction of financial benefits in the land use permitting process.

532. Defendants granted Special Use Permit approval to Dragon Springs for its use as a Place of Worship in the 2006 Resolution subject to, *inter alia*, the Annual Renewal Condition.

533. Notwithstanding the illegality of the conditions imposed by Defendant Planning Board in Dragon Springs' Special Use Permit, as discussed *supra*, Dragon Springs submitted its Renewal Application on October 9, 2012.

534. The Town Engineer's Certification entitled Dragon Springs to automatic renewal of its Special Use Permit without further review or appearance before Defendant Planning Board.

C&F: 2202077.42

535. In the Town Engineer's Certification, the Town Engineer also unlawfully determined that Dragon Springs should undergo "Site Plan modification" and "Special Use Permit modification and time period."

536. Defendant Planning Board adopted the Town Engineer's recommendations and compelled Dragon Springs to participate in municipal review of its use of the Property, which at all relevant times was as a Place of Worship, pursuant to the Town Zoning Law and consistent with Defendant Town's binding determination of such status in the ZBA Decision.

537. Dragon Springs complied with Defendant Town's demand, notwithstanding the fact that Dragon Springs' use of the Property was no longer subject to a Special Use Permit by operation of the Zoning Amendment, as discussed *supra*.

538. Under New York State Town Law, Defendants were obligated to hold a public hearing in reviewing Dragon Springs' Renewal Application within sixty-two days of filing or the Town Engineer's Certification, notwithstanding that the Renewal Application should have been approved administratively without such a hearing in October 2012.

539. Defendants unreasonably delayed inspection of the Property under the Annual Renewal Condition by approximately three months and did not commence such a public hearing until May 8, 2013.

540. Under New York State Town Law, Defendants were obligated to issue a determination on Dragon Springs' Renewal Application within sixty-two days after a public hearing.

C&F: 2202077.42

541. More than 124 days have passed since Dragon Springs' Renewal Application, more than 124 days have passed since the Town Engineer's Certification, and more than sixty-two days have passed since Defendants' May 8, 2013 public hearing on Dragon Springs' Renewal Application.

542. Defendants have not yet issued a decision on Dragon Springs' Renewal Application for Special Use Permit renewal.

543. Accordingly, Defendants have unreasonably delayed in holding a public hearing and issuing a final determination on Dragon Springs' Renewal Application for Special Use Permit renewal.

544. Dragon Springs is therefore entitled to a decision, order, and judgment remanding Dragon Springs' Renewal Application to Defendants for a lawful, just, and proper decision thereon.

## SEVENTEENTH CLAIM FOR RELIEF

### For Redress Under Article 78 Of The New York Civil Practice Law And Rules

545. Dragon Springs respectfully repeats and realleges all prior allegations of the Complaint with the same full force and effect as if set forth at length and verbatim.

546. Under New York State law, Dragon Springs had a property right in its 427 ± acre Property as a fee owner beginning in or about 2001 and pursuant to the ZBA Decision.

547. Defendants, acting in their capacity as governmental entities and/or agents, are authorized by New York State law to impose a system of land use regulation on real property owners within in the Town.

C&F: 2202077.42

548. Defendants imposed such a system of land use regulation pursuant to an adopted Town Zoning Law.

549. Defendants selectively imposed restrictive land use regulations and conditions upon Dragon Springs, which imposed a substantial burden on Dragon Springs' and its worshippers' free exercise of their faith.

550. Defendant Planning Board does not have discretion under New York State law to deny Site Plan approval by intentional delay involving actions patently beyond their statutory authority and the bounds of the law, including the imposition of illegal conditions of approval and the attempted exaction of financial benefits in the land use permitting process.

551. Defendants granted Site Plan approval to Dragon Springs for the development of the Temple in, *inter alia*, the 2006 Resolution and 2011 Site Plan Approval.

552. Notwithstanding the illegality of Defendant Planning Board's actions in compelling Dragon Springs to submit the Redundant Site Plan Application, as discussed *supra*, Dragon Springs submitted the Redundant Site Plan Application on January 2, 2013.

553. Under New York State Town Law, Defendants were obligated to hold a public hearing in reviewing Dragon Springs' Redundant Site Plan Application within sixty-two days of filing.

554. Defendants unreasonably delayed the commencement of such a public hearing until May 8, 2013.

C&F: 2202077.42

555. Under New York State Town Law, Defendants were obligated to issue a determination on Dragon Springs' Redundant Site Plan Application within sixty-two days after a public hearing.

556. More than 124 days have passed since Dragon Springs' Redundant Site Plan Application, more than sixty-two days have passed since Defendants held a public hearing thereon, and Defendants have not yet issued a decision.

557. Accordingly, Defendants have unreasonably delayed in holding a public hearing and issuing a final determination on Dragon Springs' Redundant Site Plan Application.

558. Dragon Springs is therefore entitled to a decision, order, and judgment remanding Dragon Springs' Redundant Site Plan Application to Defendants for a lawful, just, and proper decision thereon.

C&F: 2202077.42

**WHEREFORE**, Dragon Springs demands Judgment against Defendants as follows:

On the First Claim for Relief:   Judgment declaring that Defendants violated the Religious Land Use and Institutionalized Persons Act of 2000 by treating Dragon Springs on less than equal terms with a nonreligious assembly or institution with respect to land use laws, and such further relief as the Court deems just and proper, including compensatory damages and the costs and expenses of this action, including Dragon Springs' reasonable attorneys' fees under 42 U.S.C. § 1988(b).

On the Second Claim for Relief:   Judgment declaring that Defendants violated the Religious Land Use and Institutionalized Persons Act of 2000 by treating Dragon Springs on less than equal terms with a nonreligious assembly or institution with respect to land use laws, and such further relief as the Court deems just and proper, including compensatory damages and the costs and expenses of this action, including Dragon Springs' reasonable attorneys' fees under 42 U.S.C. § 1988(b).

On the Third Claim for Relief:   Judgment declaring that Defendants violated the Religious Land Use and Institutionalized Persons Act of 2000 by treating Dragon Springs on less than equal terms with a nonreligious assembly or institution with respect to land use laws, and such further relief as the Court deems just and proper, including compensatory damages and the costs and expenses of this action, including Dragon Springs' reasonable attorneys' fees under 42 U.S.C. § 1988(b).

On the Fourth Claim for Relief:   Judgment declaring that Defendants violated Dragon Springs' right to equal protection of the law under the Fourteenth Amendment.

On the Fifth Claim for Relief:   Judgment declaring that Defendants violated Dragon Springs' right to equal protection of the law under the Fourteenth Amendment.

C&F: 2202077.42

On the Sixth Claim for Relief:  Judgment declaring that Defendants violated Dragon Springs' right to substantive due process of law under the Fourteenth Amendment.

On the Seventh Claim for Relief:  Judgment declaring that Defendants violated Dragon Springs' rights under the Fifth Amendment as made applicable to Defendants by the Fourteenth Amendment.

On the Eighth Claim for Relief: Judgment declaring that Defendants violated Dragon Springs' right to due process of law under the Fifth Amendment as made applicable to Defendants by the Fourteenth Amendment.

On the Ninth Claim for Relief:  A declaration ordering, judging and decreeing that:

(i)     The Zoning Amendment made a Place of Worship including religious educational uses and all customary and appurtenant uses thereto, principally permitted uses in the RR Zoning District;

(ii)    Under the Zoning Amendment, Dragon Springs is permanently entitled to use the Property as a Place of Worship in furtherance of its constitutional rights to free exercise of religion, assembly, and speech without being subject to Special Use Permit Renewal;

(iii)   Defendants have acted *ultra vires* to continue municipal review of Dragon Springs' Renewal Application after enacting the Zoning Amendment;

(iv)   Defendants are enjoined from continuing such municipal process; and

(v)    Defendants are permanently enjoined from conditioning Dragon Springs' use of the Property as a Place of Worship upon new roads paid for by Dragon Springs or any similar monetary exactions.

On the Tenth Claim for Relief:  A declaration ordering, judging and decreeing that:

(i)     Dragon Springs is permanently entitled to use the Property for religious education purposes in furtherance of its constitutional rights to free exercise of religion, assembly, and speech as of right;

(ii)    Defendants have discriminatorily and unreasonably delayed the issuance of a renewed Special Use Permit to Dragon Springs per its Renewal Application in violation of equal protection of the laws;

(iii)   Defendants have discriminatorily and unreasonably delayed the issuance of a renewed Special Use Permit to Dragon Springs in violation of state law;

114

C&F: 2202077.42

(iv)     Defendants have acted *ultra vires* by imposing an unconstitutional condition of approval in connection with Defendant Town's land use permitting process; and

(v)     By way of a mandatory permanent injunction, Defendants are required to grant Dragon Springs' Renewal Application unconditionally without further delay.

On the Eleventh Claim for Relief:  A declaration ordering, judging and decreeing that:

(i)     Dragon Springs is permanently entitled to use the Property for religious purposes in furtherance of its constitutional rights to free exercise of religion, assembly, and speech as of right;

(ii)     Defendants have discriminatorily and unreasonably limited the age and number of permanent residents and visitors that may be on the Property in violation of equal protection of the laws;

(iii)     Defendants have discriminatorily and unreasonably limited the number of permanent residents and visitors that may be on the Property in violation of state law;

(iv)     Defendants have discriminatorily and unreasonably imposed the Annual Renewal Condition for Dragon Springs' use of the Property as a Place of Worship; and

(v)     By way of a mandatory permanent injunction, Defendants are required to grant Dragon Springs' Renewal Application unconditionally without further delay.

On the Twelfth Claim for Relief:  A declaration ordering, judging and decreeing that:

(i)     Dragon Springs is permanently entitled to use the Property for religious purposes in furtherance of its constitutional rights to free exercise of religion, assembly, and speech as of right;

(ii)     Defendant Planning Board has acted completely outside the scope of its authority in reviewing, determining and/or interpreting Dragon Springs' compliance with the Town Zoning Law; and

(iii)     Upon the effective date of the Zoning Amendment, Dragon Springs was vested with the permanent right to the use of its Place of Worship, including religious education, as a principally permitted use no longer subject to a Special Use Permit.

On the Thirteenth Claim for Relief:  Judgment issuing a permanent injunction enjoining

and restraining Defendants from the continuing violation of 42 U.S.C. § 1983,

C&F: 2202077.42

compensatory damages in an amount to be determined at trial, together with reasonable attorneys fees.

On the Fourteenth Claim for Relief:  Judgment issuing a permanent injunction enjoining and restraining Defendants from interfering with Dragon Springs' First Amendment rights to the free exercise of religion and other civil rights.

On the Fifteenth Claim for Relief:  Judgment issuing a permanent injunction enjoining and restraining Defendants from interfering with Dragon Springs' rights under the New York State Constitution.

On the Sixteenth Claim for Relief: A Decision, Order, and Judgment remanding Dragon Springs' Renewal Application to Defendants for a lawful, just, and proper decision thereon.

On the Seventeenth Claim for Relief:  A Decision, Order, and Judgment remanding Dragon Springs' Redundant Site Plan Application to Defendants for a lawful, just, and proper decision thereon.

C&F: 2202077.42

<u>On All Claims For Relief</u>:  Judgment ordering such other further and different relief as to the Court may deem just and proper in the premises.

Dated: White Plains, New York
      August 23, 2013

                        Respectfully submitted,

                        **CUDDY & FEDER** LLP
                        *Attorneys for Plaintiff,*
                        *Dragon Springs Buddhist, Inc.*
                        445 Hamilton Avenue, 14th Floor
                        White Plains, New York 10601
                        (914) 761-1300

By: _____
                        Joshua J. Grauer (Attorney # 4594)
                        Jordan Brooks (Attorney # 0614)
                        **Anthony B. Gioffre, III (Attorney #0614)**

C&F: 2202077.39

## VERIFICATION

STATE OF NEW YORK          )
                          ) ss.:
COUNTY OF WESTCHESTER      )

     KAIJIN LIANG, being duly sworn, deposes and says:

     I am the President of the Plaintiff herein.  I have read the Verified Complaint and the

same is true to my knowledge except as to any information alleged upon information and belief,

and as to any such information I believe the same to be true based on the books and records

which I maintain.

                                                      KAIJIN LIANG

Sworn to before me this
20th day of August, 2013

NOTARY PUBLIC

Joshua J. Grauer
Notary Public, State of New York
No. 02GR5014822
Qualified in Westchester County
Commission Expires July 6, 2015

**EXHIBIT A**

## Town of Deerpark – Zoning Law – Schedule of District Regulations

| District Intent | Principal Permitted Uses | Special Uses | Accessory Uses | Development Standard | A* | B* | C* | D* |
|---|---|---|---|---|---|---|---|---|
| **RR Rural Residential District:** This district is intended to protect the rural character of that portion of Deerpark which is subject to natural limitations or in public or semi-public use as open space and to provide for wildlife, recreation, forestry, and conservation uses in general. | One-family dwellings<br>Two-family dwellings<br>Agricultural uses<br>Home occupations<br>Equestrian uses<br>Hunting clubs<br>Public and semi-public uses<br><br>**Permitted Uses with Planning Board Approval**<br>Bait and tackle shops<br>Bed and breakfast facilities<br>Camps and campgrounds<br>Commercial greenhouses<br>Essential services<br>Funeral homes<br>Hotels, motels and resorts<br>Nursery schools<br>Places of worship<br>Residential conversions<br>Saw and planing mills | Animal hospitals, kennels and veterinary offices<br>Cemeteries<br>Extractive uses<br>Planned residential developments<br>Shooting ranges and clay targets<br>Telecommunication facilities<br>Vehicle repair garage | Garages<br>Home-energy generation devices<br>Parking areas<br>Private swimming pools<br>Private stables<br>Signs<br>Storage sheds<br>Other activities or structures customarily accessory to permitted principal or special uses<br>Other activities or structures without principle uses for farm, recreation and construction storage | Minimum average lot width/depth | 100/100 FT | 100/150 FT | 125/200 FT | 200/200 Ft |
| | | | | Front yard | 35 ft | 35 ft | 35 ft | 35 ft |
| | | | | Rear yard | 20 ft | 35 ft | 35 ft | 35 ft |
| | | | | Side yard | 20 ft | 20 ft | 35 ft | 35 ft |
| | | | | Max build height | 35 ft | 35 ft | 35 ft | 35 ft |
| | | | | Min. floor area | 1000 ft | 1000 ft | 1000 ft | 1000 ft |
| | | | | Max bldg coverage | 20% | 20% | 20% | 20% |
| | | | | Max. impervious coverage | 70% | 70% | 70% | 70% |
| | | | | Min. lot area | 10,000 SF | 15,000 SF | 25,000 SF | 1 AC |
| **RS Residential Settlement District:** This district is intended to protect the integrity of single-family residential areas of the Town from commercial and industrial intrusions that could cause a decline in the quality of life within these generally single-purpose sections of the Town. | One-family dwellings<br>Public and semi-public uses<br>Agricultural uses<br>Equestrian uses<br>**Permitted Uses with Planning Board Approval**<br>Bed and breakfast facilities<br>Essential services<br>Home occupations | | Garages<br>Home-energy generation devices<br>Parking areas<br>Private stables<br>Private swimming pools<br>Signs<br>Storage sheds<br>Other activities or structures customarily accessory to permitted principal or special uses<br>Other activities or structures without principle uses for farm, recreation and construction storage | Minimum average Lot width/depth:<br>Minimum yards:<br>  Front<br>  Side<br>  Rear<br>Maximum bldg. height<br>Min. floor area (§ 3.6):<br>Maximum bldg. coverage<br>Minimum lot area: | 200 feet<br><br>50 feet<br>35 feet<br>50 feet<br>35 feet<br>1,000 sq. ft.<br>20%<br>2 Ac. | | | |

*A. Public Water and Sewer    *B. Public Sewer Only    *C. Shared Sewer Only    *D. No Water and Sewer

# EXHIBIT B

## ADDENDUM

**DEFENDANTS OPENLY DISCRIMINATED AGAINST DRAGON SPRINGS AND ITS WORSHIPPERS. BY WAY OF ILLUSTRATION, AND WITHOUT LIMITATION, DRAGON SPRINGS RESPECTFULLY CITED THE FOLLOWING:**

- Defendants charged Dragon Springs excessive fees in connection with its entire land use application, including, but not limited to: (i) artificially high permit application fees based on gross overvaluations of the project which were designed to make Dragon Springs pay much more than other religious groups or similarly situated applicants would pay under analogous circumstances and (ii) excessive mandated escrows for "outside" professional services, pursuant to escrows mandated without budget or bonafide, customary accounting procedures.

- Throughout the application process, Defendants consistently treated Dragon Springs differently from similarly situated applicants, such as by making Dragon Springs the only applicant that needed written resolutions to be executed before its work could proceed (the processing of which resolutions were also always delayed), and in some cases never even issuing and signing the applicable approval resolution.

- Defendants illegally adjourned Planning Board meetings based on the claim that "violations" were present – conduct that is in direct contravention of New York law.

- Quorums were lacking at Dragon Springs' hearings and meetings. As a result, such hearings and meetings were cancelled or postponed at significant cost and prejudice to Dragon Springs.

- Meetings were adjourned time and again because one or another staff member was not present - despite the clear record of the absent staff member's comments and the absence of any bonafide basis not to close the hearings and take action.

- During the March 26, 2003 Planning Board meeting, when Dragon Springs understandably objected to the whole concept of the Town's maintenance of a daily log at its Place of Worship to count the number of its worshippers at the Property, Defendant Planning Board responded: "SO SUE US!"

- During the March 26, 2003 Planning Board meeting, Defendant Derek Wilson declared without basis or jurisdiction: "In terms of the occupancy of the site, there is a concern that you will use the site for other than you proposed it to be used for."

- During the April 9, 2003 Planning Board meeting, in lieu of the illegal, arbitrary and discriminatory "log," Defendant Planning Board, led by then Town Engineer Gainer, in excess of his authority as Town Engineer, then insisted that the development and internal operations of Dragon Springs be restricted so that at any given time there would be a maximum population of 200 on Dragon Springs' 427± acre property, and that specific language be inserted into a resolution to that effect.

- At the June 23, 2004 public hearing, residents of the Town of Deerpark and then Town Councilman Defendant Warren Cuddeback (acting as liaison between the Town Board and Defendant Planning Board) continued to challenge the use of the Property, with one Town Board Councilwoman disrespectfully asking whether the site was going to become "similar to Disney World"?

2

- In a thinly veiled comment clearly aimed at keeping Dragon Springs' Asian and Buddhist members away from the Town's children, then Councilmember Cuddeback declared that: "Residents are also concerned about increase in numbers in children that may attend our schools and that may lead to overcrowding and even require additional school buildings."

- During the September 24, 2003 public hearing, in a shameless display of the clear racial and religious animus consistently exhibited against Dragon Springs, Defendant Planning Board continued to press the irrelevant issue of the identity of the religious practitioners at the site, as evidenced by David Dean's remark that:

> For further edification for everyone. Has there been, and have we reached some conclusion, as to the ratio of Monks to practitioners? You are going to have one Monk and 99 practitioners? Or are you going to have 50-50?

- At a Planning Board meeting on January 28, 2004, where Dragon Springs was not in attendance, Defendant Derek Wilson stated that by not requesting that Dragon Springs pay for any Fire Department apparatus, the Cuddebackville Fire Chief was not "critically looking at the facility of this size, and looking at it from the point of view where he has the ability to require things, at this point, of the person constructing the site." Similar interference by the Planning Board with the local Fire Department's independent review and recommendations in regard to Dragon Springs never occurred during the course of the Planning Board's review of other comparable applications by what Defendants view as non-profit mainstream religious (or secular) institutions or local property owners in the Town.

C&F: 2214188.6

- Defendant Derek Wilson continued to pressure the Fire Chief to create out of thin air some obstacle that the Fire Department could place in the path of the approval process, going so far as to urge the Fire Chief to consider that: "[T]his is the time to request what [you] would need."

- During the February 25, 2004 Planning Board meeting, when the Fire Chief was still unwilling to "manufacture," as requested by Defendant Planning Board, some "need" that would slow down the approval process (or unfairly impose the cost of purchasing very expensive general municipal fire equipment for the Town), Defendant Derek Wilson then started making his own suggestions, such as a suggestion that the Fire Chief ask for a hydrant every 150 feet, despite the Fire Chief's statement that this was not necessary and that the Department was already equipped to handle any emergency.

- Throughout all of the meetings relating to fire safety the Planning Board members repeatedly pressured the Fire Chief to tell them if he needed "anything," and went so far as to cause a copy of their February 25, 2004 Planning Board Meeting Minutes to be delivered to the local fire department during a course of a meeting to request that they "read between the lines" and come up with equipment that would need to be purchased by Dragon Springs as a condition of approval of Dragon Springs' application.

- Having apparently received Defendants' message, when the Fire Chief came back to the March 10, 2004 Planning Board meeting he finally mentioned for the very first time that a new brush truck might be helpful to the local fire department. In response, the Planning Board Members then tried to steer the conversation back to a

4

C&F: 2214188.6

ladder truck which could cost Dragon Springs half a million to over three quarters of a million dollars.

- On February 26, 2007, the Town Board determined at a meeting, by a vote of 4 in favor with 1 abstention, to write a letter dated February 27, 2007 to the ZBA "reminding" the ZBA of the criteria for granting a variance request and clearly attempting to influence the Decision and prevent Dragon Springs from a fair hearing and determination.

- The Town Board of the Town of Deerpark would never have sent a letter such as its letter of February 27, 2007 to any other Agency or Board with regard to a mainstream religious organization or mainstream, Caucasian developer or development group, in a blatant attempt to influence the independent Board's decision-making.

- Throughout their endless review processes, Defendants, led by Building Inspector Defendant Emerson: (i) repeatedly refused to issue permits and Certificates of Occupancy ("C of Os") to which Dragon Springs was lawfully entitled (including with respect to Dragon Springs' Visitor Center) and (ii) suddenly and without lawful justification revoked previously valid and duly issued permits by issuing arbitrary and illegal stop work orders, all in an effort to obstruct Dragon Springs' construction of its religious facilities and to cause Dragon Springs financial harm by virtue of the resultant delays which deprived Dragon Springs of lost revenues and donations from the operation of this religious center, increased attorneys and other professional fees, increased costs for materials and other delay damages.

- In the same vein of belittling Dragon Springs' concerns over persecution, then Building Inspector Emerson unlawfully revoked a permit previously issued to

5

Dragon Springs to install a security gate, leaving Dragon Springs unprotected despite the fact that Dragon Springs' Property had been the target of vandalism and trespasses, as confirmed by local police records.

- Without notice, then Building Inspector Robert Emerson constantly entered onto Dragon Springs' Property, telling Plaintiff's representatives that he had already been on site for hours.

- At times when Dragon Springs' application was placed on the Planning Board agenda, Defendant Planning Board failed to provide Dragon Springs with advance notice of Planning Board meetings, thereby depriving Dragon Springs of advance notice so that it could plan for the meeting and could arrange for its counsel and other necessary professionals and agents to be in attendance in order to be heard.

- Routinely, and unlike other similarly situated applicants, Dragon Springs was subjected to multiple "final" Certificate of Occupancy inspections with each and every "final" list constantly changing and expanding when new requirements were added time and again to previous final C of O inspections.   This was similar to the endless delay in closing Planning Board public hearings and raising time and again of new issues months and months into the process.

C&F: 2214188.6

EXHIBIT  C

# ADDENDUM

## Background of Dragon Springs and Falun Dafa

1.      Dragon Springs is located primarily in the Town of Deerpark in Orange County of the State of New York and in a smaller part in the Town of Mt. Hope in Orange County of New York (hereinafter the "Property"). The grounds of Dragon Springs currently include three Tang-Dynasty style Buddhist Temples, one lake, one bell tower, one drum tower, gazebos, pagoda (to house Buddha statues), covered walkways, residence/reflection hall, education facilities, meditation hall, visitor center and a multipurpose building, among others.

2.      Worshippers at Dragon Springs are all practitioners of Falun Dafa (a/k/a Falun Gong).

3.      Falun Dafa is one of the 84,000 ways of the ancient Buddha School practice and was first made public in China in 1992. Falun Dafa practitioners believe in the existence of Buddhas and pay respect to them. The practice of Falun Dafa also includes five sets of physical exercises, of which the fifth set is the sitting meditation. Through a practitioner's self-improvement cultivation process according to the fundamental principle of "Truthfulness, Compassion, Forbearance," a practitioner can elevate one's mind-nature, become a better person, and ultimately be elevated to a Buddha's heavenly paradise.[1]

4.      As of 1999, the estimated number of people in China who practice Falun Dafa is about 100 million. Many individuals who practice Falun Dafa gained

---

[1] For more information on Falun Dafa (a/k/a Falun Gong), please visit www.falundafa.org or www.faluninfo.net. Note that as part of the persecution effort to eradicate Falun Gong, Chinese communist regime continuously publishes and arranges to publish in various sham websites voluminous false and misleading information defaming Falun Gong. For reliable information, please visit the official websites of Falun Dafa or links referred to in these websites.

tremendous health benefits and significant improvement and harmony in life and societal circumstances.

5. As Falun Dafa and its peaceful practice became increasingly popular in China, the Chinese communist party, headed by the former president of China, Jiang Zemin ("Jiang"), was threatened by the increased popularity of the principle, "Truthfulness, Compassion and Forbearance." Jiang despotically ordered, on or about July 20, 1999, for the immediate persecution and complete elimination of Falun Dafa and its principles.

6. Jiang's order of the persecution of Falun Dafa practitioners includes, but is not limited to, physical torturing, murdering, injection of psychotic drugs, and mental brainwashing of Falun Dafa practitioners. For more than fourteen years and continuing, the Chinese communist regime has been engaging all its apparatuses, administrations, and establishments, in all their possible means, to participate fully in the persecution of Falun Dafa.

7. To ensure the extensiveness of the persecution, Jiang personally established a special "610 Office" to oversee the reach and depth of the persecution of Falun Dafa and to more particularly achieve the elimination of Falun Dafa and its practitioners by "defaming their reputations, bankrupting them financially, and destroying them physically."

8. In an attempt to more extensively, widely, thoroughly and vigorously persecute Falun Dafa in China and worldwide, Jiang extended the persecution of Falun Dafa overseas by, *inter alia*, approaching local government officials and individuals of influence with false information on Falun Gong practitioners and/or using other illicit means in an attempt to influence their decisions, sending spurious and/or specious emails (oftentimes with attachments of viruses), false and misleading

2

information, and/or other materials to local government officials and individuals of influence by pretending to be Falun Gong practitioners in an attempt to, *inter alia*, destroy the reputations of Falun Gong practitioners, commanding through its administration and the local Chinese consulates to spend tremendous resources to feed defamatory and misleading materials to the international media, have defamatory materials prepared in China republished in the local newspapers and websites, and by engaging pro-communist agents outside China to threaten and commit violent acts against identified local Falun Dafa practitioners.

9.      The extent and severity of the persecution and abuse that is targeted against Falun Gong practitioners at both China's national level and in local provinces, have been confirmed and extensively documented by the United States Government in its Department of State Annual Reports on International Religious Freedom, by the United Nations in its many reports which are collected by the Falun Gong Human Rights Working Group, as well as in reports issued by non-governmental human rights monitoring groups such as Amnesty International and Human Rights Watch.

10.      A 2006 Investigative Report on Organ Harvesting of Falun Gong Practitioners, which is updated in 2007 and continuously supplemented to this date, was co-authored by human rights investigators David Matas, a Canadian Human Rights attorney, and David Kilgour, former Canadian Secretary of State for Asia-Pacific, which investigative report led to the introduction in June 2013 by United States Representative Ros-Lehtinen and United States Representative Andrews of the Bipartisan House Resolution 281 for Condemning China's Reported Practice of Harvesting Organs from Prisoners of Conscience.

11.      Some practitioners who practice Falun Gong in China are monks of the Buddha School. As all practitioners who practice Falun Gong in China are under

3                    C&F: 2229283.2

persecution, these monks are no exception. Dragon Springs Temple ground is originally built, *inter alia*, with these persecuted monks in mind. It has been the hope that the Dragon Springs Temple ground can be a place for these monks to reside safely and be an environment for them to continue their practice of Falun Dafa through observing daily religious routines and rituals.

12.   Since the persecution of Falun Dafa started in China in 1999, this particular group of practitioners has become a special target of persecution because of their easily identifiable appearance. Continuous efforts have been made to rescue these monks from the severe persecution in China but because the communist regime has been particularly targeting them for persecution, it has been extremely difficult to rescue the practitioner monks over the years.

13.   Since the Temples have been built, practitioners of Falun Dafa have traveled from different areas at different times to pay respect to the Buddha statues housed inside the Temples and have been using Dragon Springs as a place for their religious assembly. As the persecution continues for more than fourteen years, Dragon Springs and its facilities become an important place for educating the younger generation of Falun Dafa practitioners about Falun Dafa's self-cultivation and religious principles and the ongoing persecution. The educational use of the Temple facilities is intended and serves to further Dragon Spring's religious purposes and mission.

14.   The Temples, statues of Buddhas, and deities, religious figures, meditation and prayer halls, pagoda, visitor facilities, living quarters, educational facilities, and other related structures and appurtenances are essential to the daily religious practice of the followers and practitioners of Falun Dafa at Dragon Springs.

15.   Since March of 2001 to this date, Dragon Springs has applied from the Planning Board as-of-right land use approvals in order to obtain the necessary

C&F: 2229283.2

permission to construct, use and occupy, *inter alia*, sacred Temples and Houses of Worship, together with accessory and related structures and appurtenances for its religious use and purpose.

C&F: 2229283.2